**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NADINA LOESEL and JENNIFER TURIANO, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br>CRYSTAL RUN HEALTHCARE PHYSICIANS LLP, a New York limited liability partnership, and CRYSTAL RUN AMBULATORY SURGERY CENTER OF MIDDLETOWN, LLC, a New York limited liability company,<br><br>Defendants. | Civil Action<br>Case No. 7:26-cv-00655<br><br>**CLASS ACTION SECOND AMENDED COMPLAINT AND JURY DEMAND** |

## CLASS ACTION SECOND AMENDED COMPLAINT

Plaintiffs, Nadina Loesel and Jennifer Turiano ("Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members"), bring this Class Action Complaint ("Complaint") against Defendants Crystal Run Healthcare Physicians, LLP and Crystal Run Ambulatory Surgery Center of Middletown, LLC (collectively, "Crystal Run Healthcare," or "Defendants"), and allege as follows based upon personal knowledge as to Plaintiffs' own acts and experiences, and upon information and belief, including investigation by counsel, as to all other matters:

## NATURE OF THE ACTION

1. This is a class action lawsuit arising from Crystal Run Healthcare's systematic interception and disclosure of patients' and website visitors' sensitive personal health information and electronic communications to third parties, including Google LLC

("Google") and The Trade Desk, Inc. ("The Trade Desk"), without prior notice or consent, through tracking technologies embedded in Defendants' website, www.crystalrunhealthcare.com (the "Website").

2. Crystal Run Healthcare is one of the largest multi-specialty physician groups in the Hudson Valley region of New York. Through its Website, Crystal Run Healthcare allows visitors to search for physicians and medical facilities, explore health services and medical specialties, pay bills, request callbacks, and register as new patients.

3. Unbeknownst to Website visitors, Crystal Run Healthcare has knowingly implemented third-party tracking technologies on its Website, including Google's DoubleClick tracking platform (the "DoubleClick Tracker") and The Trade Desk tracking platform (the "Trade Desk Tracker"), (collectively, the "Trackers"). When Website visitors search for doctors or medical specialists, research health conditions, seek information about specific medical services, or interact with other health-related content, Crystal Run Healthcare enables Google and The Trade Desk to intercept these electronic communications without consent.

4. The intercepted information includes: (a) the names of physicians from whom users are seeking treatment; (b) users' medical specialties and facilities viewed; (c) when users request a callback; (d) when users click to pay a bill; (e) users' free-text searches made via the site's search bar, including searches for sensitive medical conditions; and (f) every page URL visited by users on the Website.

5. This interception of private electronic communications occurs in real-time, without appropriate notice to visitors and without obtaining their consent, in violation of:

(1) the Electronic Communications Privacy Act (the "ECPA"), 18 U.S.C. § 2511 *et seq.*; (2) breach of implied contract; (3) common law protections against invasion of privacy; and (4) principles of unjust enrichment.

6. Through this action, Plaintiffs seek to remedy these widespread privacy violations on behalf of a nationwide class, obtain appropriate remedies for thousands of affected individuals, and prevent the continued unauthorized interception of patients' electronic communications through Defendants' Website.

## PARTIES

7. Plaintiff Nadina Loesel is a natural person and citizen of New York, who resides in Middletown, New York.

8. Jennifer Turiano is a natural person and citizen of New York, who resides in Monroe, New York.

9. Defendant Crystal Run Healthcare Physicians, LLP is a limited liability partnership organized under the laws of New York, with its principal place of business and registered address at 155 Crystal Run Road, Middletown, Orange County, New York.

10. Defendant Crystal Run Ambulatory Surgery Center of Middletown, LLC is a limited liability company organized under the laws of New York, with its principal place of business in Middletown, Orange County, New York, and its registered address at 600 Mamaroneck Avenue #400, Harrison, Westchester County, New York.

11. Upon information and belief, Crystal Run Healthcare Physicians, LLP and Crystal Run Ambulatory Surgery Center of Middletown, LLC, jointly operate the Website at issue and control the implementation of tracking technologies on that Website.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because: (a) this is a class action involving more than 100 class members; (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) minimal diversity exists because at least one member of the proposed class is a citizen of a state different from at least one Defendant.

13. This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law, specifically the Electronic Communications Privacy Act, 18 U.S.C. § 2511, *et seq.*

14. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because they are so related to the federal claims that they form part of the same case or controversy.

15. This Court has personal jurisdiction over Defendants as Defendants are headquartered in New York, conduct substantial and continuous business within New York and within this judicial district. Crystal Run Healthcare operates multiple healthcare facilities within the Southern District of New York, and is headquartered in Middletown, New York. Crystal Run Healthcare actively targets New York residents through its

interactive Website, which allows users to find physicians, schedule appointments at its local facilities, and engage with its healthcare operations. This lawsuit arises directly from Crystal Run Healthcare's conduct related to this Website, specifically its implementation of tracking technology that intercepted the private electronic communications of New York residents accessing the site from within this District.

16. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendants reside in this District and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District. Specifically, Plaintiffs and Class Members who reside in the Southern District of New York used computers located within this District to access Crystal Run Healthcare's Website. The alleged unlawful interception of their sensitive electronic communications, the central harm in this case, occurred while these users were physically present in this District. Furthermore, the website interactions concerned the seeking of medical services from Crystal Run Healthcare's physicians and facilities located within this District.

## FACTUAL ALLEGATIONS

*i. Overview of Website Tracking on Healthcare Websites*

17. Certain websites employ tracking technologies that collect personal data about users' online activities. These tracking technologies have become increasingly sophisticated, evolving from simple cookies to complex tracking systems that can monitor detailed user behavior across websites and devices.

18. Website-tracking technologies typically function by placing small pieces of code on websites that are downloaded to a user's browser when they visit the site. Invisible to website users, this code enables the collection of various types of data about the user's interactions with the website, which is transmitted to third-party servers. These tracking codes operate invisibly to ordinary website visitors. Nothing in a user's normal browsing experience would alert them to the presence of these technologies or the transmission of their communications to third parties.

19. The most basic form of website tracking involves cookies, which are small text files stored on a user's device that identify users and their browsing activity. First-party cookies are placed by the website the user is visiting directly, while third-party cookies are placed by domains other than the one the user is visiting. These third-party cookies enable tracking across multiple websites and are commonly used for advertising and analytics purposes.

20. JavaScript-based trackers represent a more sophisticated tracking method. Website owners implement these trackers by embedding JavaScript code snippets into their website's source code. When a user loads a webpage containing such code, the tracker is downloaded onto the user's browser, where it activates and collects data about user behavior, which is then transmitted to the tracker provider's servers in real-time.

21. The interception of healthcare-related communications through these tracking technologies is particularly problematic, as it can reveal highly personal and sensitive medical conditions, treatment interests, and care-seeking behaviors to third parties without patients' knowledge or explicit consent.

22. As detailed in this Complaint, Crystal Run Healthcare has implemented such tracking technology on its Website, resulting in the unauthorized interception of visitors' electronic communications by The Trade Desk.

*ii. Google's DoubleClick Tracking Platform*

23. Google LLC ("Google") is a multinational technology company headquartered in Mountain View, California. Google operates one of the world's largest online advertising platforms, generating over $200 billion in annual revenue primarily through targeted advertising services. Google's business model depends on collecting vast amounts of user data across its numerous products and services, including Google Search, Gmail, YouTube, and Android, which it then leverages to deliver targeted advertisements.

24. Google owns the DoubleClick digital advertising platform. DoubleClick is designed to collect information about user behavior on websites in order to improve the targeting and effectiveness of advertising campaigns. DoubleClick's tracking technologies (the "DoubleClick Tracker") automate the ad buying process and use collected data for targeted advertising initiatives.

25. Website owners or administrators implement the DoubleClick Tracker by adding a snippet of JavaScript code to their website, typically in the header section of the site's code. Crystal Run Healthcare has implemented the DoubleClick Tracker on its Website.

26. Once implemented, the DoubleClick Tracker loads automatically and immediately whenever a user visits a page containing the Tracker's source code. The

tracking code executes in the background without any visible indication to the user, making it completely invisible to ordinary website visitors. Only users with technical knowledge who deliberately inspect the page's source code or use specialized browser tools might detect the presence of these tracking mechanisms and the interception of their communications by Google. The surreptitious nature of the Tracker means that users typically have no idea that their electronic communications are being intercepted by third parties like Google.

27. The DoubleClick Tracker collects data on user interactions with a website and transmits these details to Google. These interactions may include page views, clicks, form submissions, and other custom-defined actions. The DoubleClick Tracker tracks these as "conversions" or "activities," primarily for advertising and attribution purposes.

28. Through the DoubleClick Tracker, Google creates and assigns unique identifiers to website visitors, including through the IDE and the DSID cookies. Each of the IDE and DSID cookies contains a string of numbers and letters. The IDE cookie is unique to each user's browser and is used to record user actions and measure ad effectiveness. For users signed into their Google accounts when accessing a website that includes the DoubleClick Tracker, the DSID cookie is unique to that user's Google account and is used to identify signed-in users across Google services to deliver personalized advertisements. These identifiers can be associated with a user's browser or device over extended periods of time.

29. The IDE and DSID cookies can constitute personally identifiable information ("PII") as they are unique to each user and can be used to identify individuals.

30. Google's documentation also confirms that DoubleClick collects and stores IP addresses in server logs. An IP address is a globally unique numerical identifier that guides or routes communications across the internet. Often written as four sets of numbers separated by periods (*e.g.*, 94.140.9.22), Internet Service Providers assign IP addresses to networking devices such as modems or routers.

31. IP addresses function as the essential addressing system of the internet. Just as a telephone number routes calls to the correct household, an IP address is necessary for routing internet communications to the correct location. Importantly, IP addresses reveal the geographic location of internet users. Free online "IP lookup" services use databases that map IP addresses to geographic areas and potentially specific households, often providing information about the country, city, county, approximate coordinates, or even the internet service provider associated with the address.

32. The geolocation capability of IP addresses makes them extraordinarily valuable for digital advertising and tracking. IP addresses allow companies to target advertisements to users in specific geographic areas with over 95% accuracy and track user interactions across multiple websites, building detailed profiles of users' browsing habits tied to their location.

33. IP addresses are particularly powerful when combined with persistent identifiers like the IDE or DSID cookies. When individuals use their devices across different locations (home, work, coffee shops), each location has its own IP address. By tracking these movement patterns between different IP addresses and correlating them with a cookie, Google can build detailed profiles of individual users' daily routines and

behaviors that distinguish them from others who may share the same IP address. This combination of cookies and IP address patterns allows Google to identify and track specific individuals with remarkable precision, even when multiple people share the same household or workplace network.

34. For these reasons, Europe's General Data Protection Regulation ("GDPR") classifies IP addresses as "personal data," recognizing that even data that has been de-identified or pseudonymized but can be used to re-identify a person remains personal data. When Google combines IP addresses with the IDE or DSID cookies and the sensitive health information intercepted from Crystal Run Healthcare's Website, it creates a comprehensive digital profile that can identify specific individuals and their medical interests.

35. The DoubleClick Tracker enables ad retargeting. This means the data gathered by the Tracker and associated with Website users through the cookies allow Crystal Run Healthcare to display targeted advertisements to those same users on other websites based on their previous interactions with Crystal Run Healthcare's Website. This means that sensitive health information intercepted by the DoubleClick Tracker could potentially influence the advertisements displayed to users across the internet, creating ongoing privacy concerns that extend well beyond the initial Website visit.

36. The DoubleClick Tracker also works in concert with Google's vast advertising network, which spans millions of websites. This means that the scope and impact of the interception facilitated by Crystal Run Healthcare extends far beyond its own Website, potentially affecting users' experiences across the entire internet ecosystem.

When combined with Google's other data sources, the information intercepted through the DoubleClick Tracker enables even more precise identification and tracking of individuals.

37. Upon information and belief, Google combines the sensitive health information intercepted through the DoubleClick Tracker with other data points in its possession to create comprehensive user profiles that include intimate details about individuals' medical conditions, treatment interests, and healthcare-seeking behaviors. These profiles can then be monetized through targeted advertising that may reveal or allude to users' private health concerns.

*iii. The Trade Desk Tracking Platform*

38. The Trade Desk is a publicly traded technology company headquartered in Ventura, California. With annual revenues exceeding $2.4 billion, its platform enables advertisers and advertising agencies to bid on and purchase advertising inventory from a wide array of sources in real-time. This allows for the automated buying of ad space across websites, mobile apps, connected TVs, and other digital channels. The platform provides sophisticated tools for targeting specific audiences, measuring campaign effectiveness, and optimizing advertising spend to achieve the best possible return on investment.

39. A core component of The Trade Desk's platform is its ability to serve highly targeted ads to consumers. When a user visits a website that has integrated The Trade Desk's technology, the platform collects data about that user's online behavior. This data, which includes the websites users visit, the content they interact with, and their device information, is often combined with additional data from third-party data brokers and the

advertiser's own customer information. By aggregating and analyzing this information, The Trade Desk enables advertisers to create detailed profiles of consumers. These profiles allow for highly targeted advertising, where ads are shown to individuals who are most likely to be interested in a particular product or service, based on their online activities, inferred interests, and demographic characteristics. This capability for granular audience segmentation and targeting is what makes the platform a powerful tool for advertisers and a significant concern from a privacy perspective.

40. To power its advertising platform and enable this data collection, The Trade Desk provides website operators with a tracking system that collects user interaction data for the purpose of behavioral targeting and audience profiling. This system is typically implemented by embedding a JavaScript snippet on the website, which connects to The Trade Desk's servers through the domain adsrvr.org.

41. Website owners or administrators implement The Trade Desk Tracker by adding a snippet of JavaScript code to their website, typically in the header section of the site's code. Crystal Run Healthcare has implemented The Trade Desk Tracker on its Website.

42. Once implemented in a website's source code, The Trade Desk Tracker loads automatically and immediately whenever a user visits any page containing the tracking code. The tracking operates completely invisibly in the background, initiating outbound data transmissions to The Trade Desk's servers without any indication to users that their communications are being intercepted. The surreptitious nature of the tracker

means that users typically have no idea that their electronic communications are being intercepted and transmitted to The Trade Desk.

43. When users interact with websites that include The Trade Desk Tracker, The Trade Desk assigns a persistent identifier known as the Trade Desk ID ("TDID"), which is stored as a cookie in users' browsers. The TDID is a unique alphanumeric string that serves as a persistent digital fingerprint for each visitor across The Trade Desk's entire ecosystem.

44. The TDID enables The Trade Desk to: (a) uniquely identify visitors across multiple websites and devices; (b) track visitor behavior across domains through persistent cookies; (c) create comprehensive user profiles based on browsing behavior; and (d) enable targeted advertising based on users' interests and online activities.

45. The Trade Desk's platform uses the collected data to produce a mapping of devices that may be related to each other, meaning that they might be used by the same person or by people within the same household. This cross-device tracking capability allows The Trade Desk to follow users across multiple devices and browsing sessions, creating a comprehensive profile of their online activities.

46. The intercepted data collected by The Trade Desk is used to deliver targeted advertising campaigns tailored to users' interests and behaviors. When combined with data from across The Trade Desk's network of partner websites, this information enables precise identification and tracking of individuals throughout the internet ecosystem.

47. In addition to the TDID cookie, The Trade Desk Tracker collects users' IP addresses. When The Trade Desk correlates TDID cookie identifiers with IP address data,

it can identify and track specific individuals across multiple devices and browsing sessions, distinguish between multiple users within the same household or network, map behavioral patterns as individuals move between locations, and track users' geographic locations.

48. The data intercepted by The Trade Desk is not limited to general browsing. It may also include sensitive health-related information (such as physician searches, appointment scheduling, or specific medical conditions researched) when its tracking code is embedded in healthcare websites. This allows The Trade Desk to build comprehensive profiles of individuals that merge medical interests with broader online behaviors.

*iv. Visitors to the Website Reasonably Expect Their Information to Stay Private*

49. Crystal Run Healthcare operates its Website as an extension of its healthcare services, facilitating patient care and the provision of health information. The Website allows users and patients to search for physicians by name, specialty, location, and other criteria; schedule appointments with physicians; explore health services and medical conditions; pay bills; request callbacks; and locate medical facilities.

50. When using these online services, visitors input their medical information, including private and confidential information regarding their medical conditions and treatment, with the reasonable expectation that such information will be kept confidential and used only for legitimate healthcare purposes.

51. Users of the Website reasonably expect that their communications and activities will remain private, particularly given Crystal Run Healthcare's status as a healthcare provider and covered entity subject to HIPAA and other privacy regulations, as

well as Crystal Run Healthcare's professional and ethical obligations to protect patient confidentiality.

52. This expectation of privacy is reinforced by longstanding regulatory principles and enforcement actions in the healthcare sector. Federal privacy regulations have long recognized that health information is entitled to broad privacy protections. In 2013, HHS clarified through formal rulemaking that information need not contain specific medical terms to be protected under HIPAA: if it "is tied to a covered entity, then it is protected health information by definition since it is indicative that the individual received health care services or benefits from the covered entity." 78 Fed. Reg. 5566, 5598 (January 25, 2013).

53. Crystal Run Healthcare's conduct described in this Complaint is in violation of HIPAA, which imposes criminal penalties for knowingly disclosing individually identifiable health information ("IIHI") to third parties. 42 U.S.C. § 1320d-6(a)(3) defines IIHI as: "any information, including demographic information collected from an individual, that---(A) is created or received by a health care provider . . . (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual."

54. Crystal Run Healthcare intended to share and monetize its patients' IIHI, which is in violation of HIPAA and common law duties.

55. In 2023, the Federal Trade Commission and HHS warned healthcare providers via letter about their obligations to protect against impermissible disclosures of personal health information through web-tracking technologies, emphasizing that unauthorized disclosure of such information through trackers can violate federal law. The letter warned that "technologies, such as the Meta/Facebook pixel and Google Analytics, [] can track a user's online activities" and "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users."

56. Users would not reasonably expect that simply by visiting Crystal Run Healthcare's Website to search for doctors, schedule appointments, research medical conditions, or explore treatment options, their sensitive health information would be intercepted by Google and The Trade Desk for purposes unrelated to their healthcare needs.

*v. Crystal Run Healthcare's Implementation of the DoubleClick and Trade Desk Trackers*

57. Crystal Run Healthcare has deliberately implemented the DoubleClick Tracker and Trade Desk Tracker in the source code of its Website, procuring, aiding and abetting Google and The Trade Desk to intercept sensitive health information and electronic communications of its patients and Website visitors without proper consent.

58. The DoubleClick and Trade Desk Trackers operate on pages of the Website where users search for medical specialists, research health conditions, locate treatment facilities, view medical specialties, pay bills, request callbacks, and schedule

appointments, intercepting information about users' activities on these pages. The Trackers operate invisibly to Website visitors, who have no meaningful way of knowing that their sensitive health queries and browsing behaviors are being intercepted by Google and The Trade Desk.

59. The information intercepted through these Trackers includes electronic communications between the visitor and Crystal Run Healthcare regarding the visitor's healthcare interests, treatment-seeking behavior, and medical preferences. When combined with the IDE, DSID, and TDID cookies and a user's IP address, this information allows Google and The Trade Desk to identify individual users and associate sensitive health information with their digital profiles.

60. Upon information and belief, Google and The Trade Desk add this intercepted healthcare-related data to their vast and sophisticated commercial advertising ecosystems, combining it with information from their networks of partner websites. The data is used to create comprehensive user profiles that include sensitive health information which can be used for targeted advertising and other commercial purposes, including real-time ad bidding, behavioral segmentation, and cross-contextual tracking, all of which serve purposes entirely unrelated to the provision of healthcare. In procuring the interception and transmission of users' sensitive health-related information to Google and The Trade Desk, Crystal Run Healthcare initiates the commercial exploitation of that information, an action at odds with the reasonable privacy expectations and the legal protections afforded to patients.

*vi. Examples of Personal Data Collection and Disclosure on the Website*

61. Crystal Run Healthcare's implementation of the DoubleClick and Trade Desk Trackers results in the systematic interception of highly sensitive health information. The following examples demonstrate the scope and nature of these privacy violations.

62. **Physician Searches and Selection:** The "Find a Doctor" page on Crystal Run Healthcare's Website allows users to search for physicians by first name, last name, specialty, and location. When a user searches for a specific provider or condition, this information is automatically transmitted to Google and The Trade Desk. For example, when a user searches for a physician by last name "Booker," the DoubleClick and Trade Desk Trackers intercept and transmit information to Google and The Trade Desk including: (a) the search term; (b) the IDE, DSID, and/or TDID cookies that uniquely identify the user; (c) the user's IP address; and (d) a timestamp recording when the search occurred.

63. When a user then views a provider's profile page, the DoubleClick and Trade Desk Trackers intercept and transmit information to Google and The Trade Desk including: (a) the full name of the selected physician; (b) the IDE, DSID, and/or TDID cookies that uniquely identify the user; (c) the user's IP address; and (d) a timestamp recording when the selection occurred. This transmission creates a record linking the individual user to their interest in a specific healthcare provider.

64. **Medical Specialty Pages:** When users navigate to view specific medical specialties through the Website's menu, such as "Behavioral Health & Psychiatry," the DoubleClick and Trade Desk Trackers intercept this information. The Trackers transmit

information to Google and The Trade Desk including: (a) the specific specialty being viewed; (b) the IDE, DSID, and/or TDID cookies that uniquely identify the user; (c) the user's IP address; and (d) a timestamp recording when the page was visited. This creates a record that the identified individual at a specific geographic location is seeking information about sensitive mental health services.

65. **Medical Facility Pages:** When users view pages for specific medical facilities, such as the Monroe medical facility, the DoubleClick and Trade Desk Trackers intercept this information. They transmit information to Google and The Trade Desk including: (a) the facility being viewed; (b) the IDE, DSID, and/or TDID cookies that uniquely identify the user; (c) the user's IP address; and (d) a timestamp recording when the page was visited. This creates a record of which facilities users are interested in visiting.

66. **Bill Payment:** When users click to pay their bill on the Website, the DoubleClick and Trade Desk Trackers intercept this action. The Trackers transmit information to Google and The Trade Desk including: (a) the fact that the user clicked to pay a bill on Crystal Run Healthcare's Website; (b) the IDE, DSID, and/or TDID cookies that uniquely identify the user; (c) the user's IP address; and (d) a timestamp recording when the event occurred. This creates a record from which it can be inferred that an identified individual is a patient of Crystal Run Healthcare actively managing their healthcare payments.

67. **Callback Requests:** When users click to request a callback and submit the callback form, the DoubleClick and Trade Desk Trackers intercept these actions. The

Trackers transmit information to Google and The Trade Desk including: (a) the fact that the user requested a callback; (b) the fact that the user submitted the callback form; (c) the IDE, DSID, and/or TDID cookies that uniquely identify the user; (d) the user's IP address; and (e) timestamps recording when these events occurred.

68. **New Patient Registration:** When new patients click to request an appointment and submit the registration form, the DoubleClick and Trade Desk Trackers intercept these actions. The Trackers transmit information to Google and The Trade Desk including: (a) the fact that the user is a new patient seeking care; (b) the fact that the user submitted an appointment request; (c) the IDE, DSID, and/or TDID cookies that uniquely identify the user; (d) the user's IP address; and (e) timestamps recording when these events occurred.

69. **Free-Text Search Queries**: Any information entered into the Website's general search bar is intercepted by the DoubleClick and Trade Desk Trackers. For example, if a user searches for a condition such as "Ovarian Cancer" in the search bar, the Trackers transmit information to Google and The Trade Desk including: (a) the complete search query; (b) the IDE, DSID, and/or TDID cookies that uniquely identify the user; (c) the user's IP address; and (d) a timestamp recording when the search occurred.

70. When users then view search results or articles about sensitive medical conditions, this information is likewise intercepted and transmitted. For example, if the user clicks the first search result on the Website after searching for "Ovarian Cancer" ("Ovarian Cancer: Signs, Symptoms, Risk Factors and Prevention"), the name of this page, as featured in the page's URL, is transmitted to Google and The Trade Desk, along with

(a) the IDE, DSID, and/or TDID cookies that uniquely identify the user; (b) the user's IP address; and (c) a timestamp recording when the page was accessed. This enables Google and The Trade Desk to build profiles of users' health concerns based on their accessing of search results, along with their behavior and geographic location.

71. **Temporal Patterns and Behavioral Analysis:** In addition to the content of searches and interactions, the DoubleClick and Trade Desk Trackers also collect timestamp data showing precisely when each interaction occurs. This temporal information reveals behavioral patterns about users' healthcare-seeking activities. The timestamp data enables Google and The Trade Desk to determine: (a) the complete progression of users' journeys through the Website, revealing potential connections between search terms, doctors' pages viewed, and conditions researched; (b) the evolution of users' health journeys by tracking the sequence and timing of searches from initial symptoms to specific conditions to treatment options; (c) the urgency of users' health concerns based on search times; (d) the frequency and regularity of health-related searches, distinguishing between chronic condition management and acute health crises; (e) the duration users spend researching specific conditions, indicating their level of concern or the severity of their situation; and (f) patterns that may reveal work or life impacts of health conditions based on when searches occur.

*vii. Defendants' Responsibility for the Interception of Electronic Communications*

72. Although Google and The Trade Desk perform the technical functions of intercepting electronic communications, Crystal Run Healthcare bears full legal

responsibility for these actions as the entity that has procured Google and The Trade Desk to intercept these communications.

73. Crystal Run Healthcare made the affirmative decision to implement the DoubleClick and Trade Desk Trackers on its Website. This implementation was a deliberate action requiring Crystal Run Healthcare's web administrators to copy the tracking code and insert it into the Website's source code. Without Crystal Run Healthcare's deliberate implementation of this code, Google and The Trade Desk would have no access to the electronic communications of Defendants' Website visitors.

74. Crystal Run Healthcare controls which pages of its Website contain the tracking code and could choose to exclude tracking from sensitive pages where healthcare information is accessed or inputted, yet it has chosen to implement tracking across these sensitive areas of its Website. Crystal Run Healthcare maintains complete control over its Website and has the ability to remove or modify the Trackers at any time. Its continued use of these Trackers represents an ongoing choice to procure Google and The Trade Desk to intercept electronic communications from visitors to the Website.

75. Crystal Run Healthcare has procured Google's and The Trade Desk's services to intercept electronic communications from its Website visitors and has arranged, aided, and abetted the interception of these communications by Google and The Trade Desk, where the data is then stored, analyzed, and potentially combined with other data in Google's and The Trade Desk's possession.

76. Crystal Run Healthcare receives direct benefits from implementing these Trackers, including the ability to deliver targeted advertising and potentially increased

advertising revenue. These benefits further establish Crystal Run Healthcare's responsibility for procuring the interception practices that generate these capabilities.

77. These arrangements constitute a procurement of another person to intercept electronic communications without the consent of all parties to the communication, in direct violation of 18 U.S.C. § 2511 of the ECPA.

*vii. Defendant's Failure to Obtain Consent for the Interception*

78. Crystal Run Healthcare fails to obtain consent from Website users before procuring the interception of their electronic communications by Google and The Trade Desk. At no point during users' interactions with the Website is their consent to such interception sought or obtained. Users are not presented with any notice of the tracking practices, are not asked to agree to such practices, and are not required to take any affirmative action manifesting consent before their electronic communications are intercepted.

79. The DoubleClick and Trade Desk Trackers begin intercepting users' electronic communications immediately and automatically upon visiting the Website, before users have any opportunity to review or consent to such practices. Users have no meaningful way to decline or opt out of this interception while still using the Website to access healthcare information and services.

**INJURY TO PLAINTIFFS AND CLASS MEMBERS**

80. Crystal Run Healthcare's procurement of unauthorized interception of Website user communications has caused actual harm to Plaintiffs and Class members in multiple ways.

81. *Invasion of Privacy:* Medical and health-related information about individuals is highly private, and its interception can result in significant embarrassment, stigma, and even discrimination. Plaintiffs and Class members have suffered an invasion of their privacy through the unauthorized interception of their electronic communications and healthcare-related activities. These communications included searches for medical specialists, searches for treatments, and inquiries about medical conditions. The interception of these communications violated Plaintiffs' and Class members' reasonable expectation that their interactions with a healthcare provider would remain private.

82. *Loss of Data Value*: Plaintiffs and Class members have been deprived of the economic value of their personal data. Personal data, especially health-related information, has significant commercial value in today's digital economy.

83. In a 2014 article by the Federal Trade Commission, the agency detailed the value of user data, particularly health information, and found that data brokers sell data in sensitive categories for a premium.[1] The Commission subsequently brought a lawsuit

---

[1] Data Brokers, A Call For Transparency And Accountability, Federal Trade Commission, (May 2014), https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf (last accessed December 21, 2025).

against one of the data brokers for selling location data regarding people who visit abortion clinics for approximately $160 for a week's worth of data.[2]

84. For years, data harvesting has been one of the fastest growing industries in the United States. Conservative estimates suggest that internet companies earn hundreds of dollars per American user through the interception and use of personal data.

85. The value of health data is well-known and has been reported on extensively in the news. For example, a 2017 article by Time Magazine titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" described the extensive market for health data and noted that the market for information was both lucrative and a significant risk to privacy.[3]

86. Due to the difficulty in obtaining health information, illegal markets also exist for such personal and sensitive information. NPR reported that health data can be "more expensive than stolen credit card numbers."[4]

87. Plaintiffs' and Class members' private and personal data, including their protected health information, IP addresses, and digital identifiers, have a recognized monetary value. Crystal Run Healthcare's procurement of unauthorized interception by Google and The Trade Desk of this sensitive personal data has deprived Plaintiffs and

---

[2] Federal Trade Commission (August 2022), https://www.ftc.gov/news-events/news/press-releases/2022/08/ftc-sues-kochava-selling-data-tracks-people-reproductive-health-clinics-places-worship-other (last accessed December 21, 2025).
[3] Adam Tanner, Time Magazine (January 2017), https://time.com/4588104/medical-data-industry/ (last accessed December 21, 2025).
[4] Aarti Shahani, *The Black Market For Stolen Health Care Data*, NPR (Feb. 13, 2015, 4:55 am), https://www.npr.org/sections/alltechconsidered/2015/02/13/385901377/the-black-market-forstolen-health-care-data (last accessed December 21, 2025).

Class members of the economic value of their personal property without proper consideration and has resulted in Crystal Run Healthcare unjustly enriching itself at the expense of Plaintiffs and Class members.

88. *Chilling Effect on Healthcare Communication:* Crystal Run Healthcare's conduct has undermined patient trust and created a chilling effect on digital healthcare communications. Plaintiffs and Class members can no longer confidently use the Website to seek medical information, locate healthcare providers, research treatments, or manage their healthcare without fear that their activities are being intercepted by third parties. This chilling effect may lead to reluctance to seek needed healthcare information or services online, potentially impacting health outcomes.

89. *Risk of Further Use of Intercepted Data:* Once intercepted by Google and The Trade Desk, Plaintiffs' and Class members' data is beyond their control. This creates an ongoing risk that their sensitive health-related information may be further processed, combined with other data sources, or potentially used by additional third parties, causing continued and future harm.

90. *Statutory Injury:* Independent of the above harms, Crystal Run Healthcare's violation of the ECPA has caused Plaintiffs and Class members to suffer statutory injury, entitling them to statutory damages provided by law.

## PLAINTIFFS' EXPERIENCES

91. Plaintiff Nadina Loesel is a citizen of New York and resides in Middletown, New York. Within the last two years, Nadina Loesel has taken the following actions on

Crystal Run Healthcare's Website: (1) used the "Find a Doctor" feature; (2) requested a new patient appointment; (3) requested a callback; (4) searched for a specific medical specialty; and (5) searched using the website's search bar.

92. Plaintiff Jennifer Turiano is a citizen of New York and resides in Monroe, New York. Within the last two years, Jennifer Turiano has taken the following actions on Crystal Run Healthcare's Website: (1) used the "Find a Doctor" feature; (2) requested a new patient appointment; (3) searched for a location; (4) searched for a specific medical specialty; and (5) searched using the website's search bar.

## CLASS ACTION ALLEGATIONS

93. Plaintiffs bring this action on behalf of themselves individually and on behalf of all other persons similarly situated pursuant to Rule 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.

94. Plaintiffs seek to represent the following nationwide class:

> All individuals who visited Crystal Run Healthcare's Website during the applicable statute of limitations period and whose electronic communications with Crystal Run Healthcare's Website were intercepted and transmitted to Google and/or The Trade Desk without the individuals' consent.
>
> Excluded from the Class are: (a) Defendants and their officers, directors, employees, subsidiaries, and affiliates; (b) the Judge presiding over this action and any member of the Judge's immediate family and staff; (c) any juror assigned to this case; and (d) governmental entities.

95. Plaintiffs reserve the right to modify, change, or expand the Class definitions based upon discovery and further investigation.

96. *Numerosity*: The Class is so numerous that joinder of all members is impracticable. Crystal Run Healthcare is one of the largest multi-specialty physician groups in the Hudson Valley region with approximately 2,400 employees. The Website receives significant traffic annually. The Class size is estimated to be in the tens or hundreds of thousands.

97. *Commonality and Predominance*: There are questions of law and fact common to the Class that predominate over any questions affecting only individual members. These common questions include:

(a) Whether Crystal Run Healthcare implemented the DoubleClick and Trade Desk Trackers on its Website;

(b) Whether the DoubleClick and Trade Desk Trackers intercepted Website users' electronic communications;

(c) Whether Crystal Run Healthcare procured, enabled, and aided and abetted the interception of Website users' electronic communications

(d) Whether Website users consented to the interception of their electronic communications;

(e) Whether Crystal Run Healthcare's conduct violated 18 U.S.C. § 2511 of the ECPA;

(f) Whether Crystal Run Healthcare's conduct breached an implied contract with Plaintiffs and Class Members;

(g) Whether Crystal Run Healthcare's procurement of interception of Website users' electronic communications constitutes an invasion of privacy;

(h) Whether Crystal Run Healthcare has been unjustly enriched through its conduct;

(i) Whether Plaintiffs and Class members are entitled to damages and other monetary relief, and if so, in what amount;

(j) Whether Plaintiffs and Class members are entitled to equitable relief, including but not limited to injunctive relief.

98. *Typicality*: Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and Class members all visited the Website and had their electronic communications intercepted without their consent. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other Class members and are based on the same legal theories.

99. *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no interests adverse or antagonistic to those of the Class.

100. *Superiority*: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for numerous reasons. The damages

suffered by many Class members may be relatively small compared to the burden and expense of individual litigation, making it difficult for Class members to individually redress the wrongs done to them. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Crystal Run Healthcare. In contrast, a class action will present far fewer management difficulties, allows claims to be heard that might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

101. *Injunctive Relief Appropriate*: Crystal Run Healthcare has acted or refused to act on grounds generally applicable to the Class as a whole, making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class.

## CAUSES OF ACTION

### COUNT I:
### Violations of the Electronic Communications Privacy Act (18 U.S.C. § 2511) (On behalf of the Class)

Plaintiffs incorporate the above paragraphs by reference and further allege:

102. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of electronic communications, and the procuring of any other person to intercept electronic communications. 18 U.S.C. § 2511(1)(a).

103. The ECPA protects both the sending and receipt of communications and provides a private right of action to any person whose electronic communications are

intercepted, disclosed, or intentionally used in violation of 18 U.S.C. § 2511(1)(a). *See* 18 U.S.C. § 2520(a).

104. The transmissions between Plaintiffs and Class members and Crystal Run Healthcare's Website are "transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and therefore constitute "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

105. The ECPA defines "content" to "include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8). The health information intercepted here, including physician searches, medical conditions, appointment requests, and treatment inquiries, constitutes content under the ECPA.

106. The DoubleClick and Trade Desk Trackers implemented by Crystal Run Healthcare constitute "electronic, mechanical, or other devices" within the meaning of 18 U.S.C. § 2510(5) because they are specifically designed to intercept and acquire the contents of electronic communications between Website visitors and Crystal Run Healthcare.

107. The ECPA defines "interception" as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). As described above, the DoubleClick and Trade Desk Trackers are embedded software that acquire the contents of users' communications as they are inputted by users into Defendants' Website, in real-time and contemporaneously with their transmission.

108. By deliberately implementing the DoubleClick and Trade Desk tracking code on its Website, Crystal Run Healthcare procured Google and The Trade Desk to intercept its visitors' electronic communications. Specifically: (a) Crystal Run Healthcare made the affirmative decision to embed Google's and The Trade Desk's code into its Website; (b) Crystal Run Healthcare's implementation of this code was the necessary predicate act that enabled Google and The Trade Desk to intercept users' communications; without Crystal Run Healthcare's actions, Google and The Trade Desk would have no access to the communications; (c) Crystal Run Healthcare controls which pages contain the tracking code and could have excluded it from sensitive areas where health information is transmitted, but chose not to; (d) Crystal Run Healthcare maintains an ongoing relationship with Google and The Trade Desk and continues to facilitate their interception of user communications; (e) Crystal Run Healthcare receives benefits from this arrangement, including advertising capabilities and potentially increased revenue, creating a quid pro quo relationship.

109. Through this procurement, Crystal Run Healthcare caused Google and The Trade Desk to intercept, in real-time, the electronic communications of users containing sensitive health information, in violation of 18 U.S.C. § 2511(1)(a).

110. By intentionally using or endeavoring to use the contents of these intercepted communications, knowing or having reason to know the information was obtained through illegal interception, Defendants violated 18 U.S.C. § 2511(1)(d).

111. Plaintiffs and Class members had a reasonable expectation that their communications with a healthcare provider's website would remain confidential and

would not be intercepted by third parties that Crystal Run Healthcare had procured for commercial purposes.

112. Users did not consent to Crystal Run Healthcare's procurement of third-party interception and sharing of their health information for advertising and analytics purposes.

113. Crystal Run Healthcare was not acting under color of law when procuring these interceptions, and no other exception to ECPA liability applies. The one-party consent exception does not apply because Crystal Run Healthcare's interception was for the purpose of committing an independent crime or tort, namely the unauthorized disclosure of PHI in violation of HIPAA, 42 U.S.C. § 1320d-6, and invasion of privacy.

114. As a direct result of Crystal Run Healthcare's violations, Plaintiffs and Class members are entitled to: (a) actual damages or statutory damages of $100 per day per violation or $10,000, whichever is greater; (b) punitive damages; and (c) reasonable attorneys' fees and costs under 18 U.S.C. § 2520.

## COUNT II

**Breach of Implied Contract**
**(On behalf of the Class)**

Plaintiffs incorporate the above paragraphs by reference and further allege:

115. Plaintiffs and Class Members entered into implied contracts with Crystal Run Healthcare when they used the Website to seek medical services, research sensitive health conditions, and manage their healthcare needs.

116. As part of these implied contracts, Plaintiffs and Class Members provided their sensitive personal health information and electronic communications to Crystal Run Healthcare.

117. In exchange, Defendants agreed to provide healthcare-related information and services and, crucially, to maintain the privacy and confidentiality of the sensitive data transmitted through the Website.

118. The terms of this implied contract were established by the nature of the physician-patient relationship, Defendants' status as a healthcare provider subject to HIPAA, and the reasonable expectations of patients seeking medical care.

119. Plaintiffs and Class Members performed their obligations under the implied contracts by providing their data and engaging with Defendants' healthcare ecosystem.

120. Defendants breached these implied contracts by systematically intercepting and disclosing Plaintiffs' and Class Members' sensitive health information to third parties, including Google and The Trade Desk, for commercial advertising purposes.

121. The breach of confidentiality was a material failure of the implied contract, as the protection of sensitive medical data is a fundamental expectation in the healthcare context.

122. As a direct and proximate result of Defendants' breach, Plaintiffs and Class Members have suffered damages, including (a) The loss of the benefit of their bargain, as they received healthcare services that were diminished in value due to the failure to provide the promised confidentiality; (b) The loss of the economic value of their sensitive personal

and health data; (c) The invasion of their privacy and the unauthorized dissemination of their private medical interests.

**COUNT III:**

**Unjust Enrichment**
**(On behalf of the Class)**

Plaintiffs incorporate the above paragraphs by reference and further allege:

123. Crystal Run Healthcare has received a benefit from Plaintiffs through the interception of their valuable personal data via the DoubleClick and Trade Desk Trackers.

124. By implementing the DoubleClick and Trade Desk Trackers on its Website, Crystal Run Healthcare has been able to procure the interception of users' electronic communications for business purposes, including marketing and advertising, thereby enriching itself at the expense of Plaintiffs.

125. Crystal Run Healthcare has retained this benefit under circumstances which make it inequitable to do so without payment of its value to Plaintiffs.

126. Plaintiffs have suffered a corresponding detriment, including the loss of the economic value of their personal data and the invasion of their privacy.

127. It would be unjust and inequitable, and would violate fundamental principles of justice, equity, and good conscience, to allow Crystal Run Healthcare to retain the benefits of its unlawful conduct.

128. Plaintiffs are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Crystal Run Healthcare through its wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, respectfully requests that this Court:

(a) Certify this case as a class action on behalf of the Class, appoint Plaintiffs as Class representatives, and appoint Plaintiffs' counsel as Class counsel;

(b) Declare that Crystal Run Healthcare's actions, as described herein, violate the ECPA, and constitute invasion of privacy and unjust enrichment;

(c) Award Plaintiffs and the Class compensatory damages in an amount to be determined at trial;

(d) Award Plaintiffs and the Class statutory damages of $10,000 or $100 per day for each violation of the ECPA, whichever is greater, as provided by 18 U.S.C. § 2520(c)(2)(B).

(e) Award Plaintiffs and the Class punitive damages;

(f) Award Plaintiffs and the Class restitution and disgorgement of all profits, benefits, and other compensation obtained by Crystal Run Healthcare from its wrongful conduct;

(g) Award injunctive relief requiring Crystal Run Healthcare to cease procuring the interception of Website users' communications without proper consent; destroy all user data intercepted through the DoubleClick and Trade Desk Trackers; and implement appropriate safeguards to ensure the protection of Website users' privacy in the future;

(h) Award pre-judgment and post-judgment interest;

(i) Award reasonable attorneys' fees and costs, as allowed by law; and

(j) Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims and issues so triable.

Respectfully submitted,

Dated: April 13, 2026

JAVERBAUM WURGAFT HICKS
KAHN WISKTROM & SININS, P.C.

By: */s/ Scott E. Reiser*
SCOTT E. REISER
103 Eisenhower Parkway, Suite 401
Roseland, NJ 07068
Tel: (973) 228-6738
Fax: (973) 403-9021
Email: sreiser@lumlaw.com
SR3676

TRAMMELL PC

By: *\/s\/ Fletch Trammell*
FLETCH TRAMMELL
*Pro Hac Vice Pending*
3262 Westheimer, #423
Houston, TX 77098
Tel: (800) 405-1740
Fax: (800) 532-0992
fletch@trammellpc.com

DON BIVENS, PLLC

By: */s/ Don Bivens*
DON BIVENS
*Pro Hac Vice Pending*
Scottsdale Quarter
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
Tel: (602) 7622661
don@donbivens.com