**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NADIA LOESEL and JENNIFER TURIANO, individually and on behalf of all others similarly situated,<br><br>Plaintiffs<br><br>v.<br><br>CRYSTAL RUN HEALTHCARE PHYSICIANS, LLP, and CRYSTAL RUN AMBULATORY SURGERY CENTER OF MIDDLETOWN, LLC,<br><br>Defendants. | Case No. 7:26-cv-00655 |

# DEFENDANTS CRYSTAL RUN HEALTHCARE PHYSICIANS, LLP AND CRYSTAL RUN AMBULATORY SURGERY CENTER OF MIDDLETOWN, LLC'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..... 1
BACKGROUND ..... 2
A. The Internet ..... 2
B. Crystal Run's Website ..... 3
C. Plaintiffs and This Litigation ..... 5
LEGAL STANDARD ..... 5
ARGUMENT ..... 6
I. Plaintiffs' Claims Under the Wiretap Act Should Be Dismissed ..... 6
A. The Wiretap Act Does Not Impose Aiding-and-Abetting Liability ..... 7
B. The Crime-Tort Exception to Party Consent Is Not Applicable ..... 8
1. Crystal Run's Alleged Use of Website Technologies on Public Webpages Did Not Violate HIPAA and Constitute an Invasion of Privacy ..... 9
2. Plaintiffs Fail to Show Crystal Run Intended to Violate HIPAA and Invade Plaintiffs' Privacy ..... 13
3. Plaintiffs Fail to Allege a Separate and Independent Crime or Tort ..... 16
C. Plaintiffs Fail to Allege that the "Contents" of Any Communications Were Intercepted ..... 17
II. Choice of Law ..... 19
III. Plaintiffs' Common Law Claims Fail as a Matter of Law ..... 19
A. Plaintiffs Fail to State a Claim for Breach of Implied Contract ..... 19
B. Plaintiffs Fail to State a Claim for Unjust Enrichment ..... 24
CONCLUSION ..... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Afriyie v. NBCUniversal Media, LLC*,
775 F.Supp.3d 791 (S.D.N.Y. 2025)....11, 24, 25

*American Hospital Association v. Becerra*,
738 F. Supp. 3d 780 (N.D. Tex. 2024) ....9, 10, 12

*Aponte v. Ne. Radiology, P.C.*,
2022 WL 1556043 (S.D.N.Y. May 16, 2022) ....22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....5

*B.K. v. Eisenhower Med. Ctr.*,
721 F. Supp. 3d 1056 (C.D. Cal. 2024) ....25

*Bell Atl. Corp. v. Twombley*,
550 U.S. 544 (2007)....5

*Beltran v. Drs. Med. Ctr. Of Modesto*,
2025 WL 1635467 (E.D. Cal. June 9, 2025) ....21

*Bittner v. United States*,
598 U.S. 85 (2023) (Gorsuch, J., concurring)....18

*BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
881 F.3d 293 (4th Cir. 2018) ....11

*Borden v. United States*,
593 U.S. 420 (2021)....13

*Call of the Wild Movie, LLC v. Does 1–1,062*,
770 F. Supp. 2d 332 (D.D.C. 2011)....11

*Camm v. Reach Fin., LLC*,
2026 WL 861670 (S.D.N.Y. Mar. 30, 2026)....21

*Caro v. Weintraub*,
618 F.3d 94 (2d Cir. 2010).... *passim*

*In re Carrier IQ, Inc.*,
78 F. Supp. 3d 1051 (N.D. Cal. 2015) ....7

*Chambliss v. CareFirst, Inc.*,
189 F. Supp. 3d 564 (D. Md. 2016) ....................22

*In Re Charter Commc'ns, Inc., Subpoena Enf't Matter*,
393 F.3d 771 (8th Cir. 2005) ....................11

*Cherny v. Emigrant Bank*,
604 F. Supp. 2d 605 (S.D.N.Y. 2009)....................24

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)....................24

*Cohen v. Casper Sleep Inc.*,
2018 WL 3392877 (S.D.N.Y. July 12, 2018) ....................15

*Cole v. Quest Diagnostics Inc.*,
2025 WL 3172640 (3d Cir. Nov. 13, 2025)....................8, 23

*Columbia Pictures Indus. v. Bunnell*,
2007 WL 2080419 (C.D. Cal. May 29, 2007) ....................11

*Cooper v. Bonobos, Inc.*,
2022 WL 170622 (S.D.N.Y. Jan. 19, 2022) ....................22

*Cooper v. Slice Techs., Inc.*,
2018 WL 2727888 (S.D.N.Y. June 6, 2018) ....................26

*Coresello v. Verizon N.Y., Inc.*,
967 N.E.2d 1177 (N.Y. 2012)....................24

*Cousin v. Sharp Healthcare*,
681 F. Supp. 3d 1117 (S.D. Cal. 2023)....................18

*Crowley v. CyberSource Corp.*,
166 F. Supp. 2d 1263 (N.D. Cal. 2001) ....................7

*Doe v. Eating Recovery Ctr. LLC*,
806 F. Supp. 3d 1109 (N.D. Cal. 2025) ....................18

*Doe v. Genesis Health Sys.*,
2025 WL 1000192 (C.D. Ill. Mar. 18, 2025)....................15

*Doe v. Kaiser Found. Health Plan, Inc.*,
2024 WL 1589982 (N.D. Cal. Apr. 11, 2024) ....................15, 16

*Doe v. Lawrence Gen. Hosp.*,
2025 WL 2808055 (D. Mass. Aug. 29, 2025) ....................15

*Doe v. Upperline Health, Inc.*,
No. 2024 WL 4953503 (S.D. Ind. Sep. 24, 2024) ....................21

*Doron Precision Sys., Inc. v. FAAC, Inc.*,
423 F. Supp. 2d 173 (S.D.N.Y. 2006)....................4

*In re DoubleClick Privacy Litig.*,
154 F. Supp. 2d 497 (S.D.N.Y. 2001)....................8, 9, 11, 14, 15

*Dunahoo v. Hewlett-Packard Co.*,
2012 WL 178332 (S.D.N.Y. Jan. 20, 2012) ....................25

*Faber v. Metro. Life Ins. Co.*,
648 F.3d 98 (2d Cir. 2011)....................6

*Freeman v. DirecTV, Inc.*,
457 F.3d 1001 (9th Cir. 2006) ....................7

*Gonzales v. Uber Techs., Inc.*,
305 F. Supp. 3d 1078 (N.D. Cal. 2018) ....................17

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
806 F.3d 125 (3d Cir. 2015)....................2, 16

*Goulart v. Cape Cod Healthcare*,
2025 WL 1745732 (D. Mass. June 24, 2025)....................15, 16

*Greene v. Clean Rite Ctrs., LLC*,
714 F. Supp. 3d 134 (E.D.N.Y. 2024) ....................24

*Hammerling v. Google, LLC*,
2024 WL 937247 (9th Cir. Mar. 5, 2024)....................26

*Hammond v. Bank of N.Y. Mellon Corp.*,
2010 WL 2643307 (S.D.N.Y. June 25, 2010) ....................19, 20

*Hannant v. Culbertson*,
2025 WL 2413894 (C.D. Ill. Aug. 20, 2025)....................12

*Harrill v. Emanuel Med. Ctr.*,
2025 WL 1635428 (E.D. Cal. June 9, 2025) ....................12

*Joiner v. NHL Enters., Inc.*,
2025 WL 2846431 (S.D.N.Y. Aug. 29, 2025)....................7

*K.L. v. Legacy Health*,
2024 WL 4794657 (D. Or. Nov. 14, 2024)....................13

*Kinda v. Carpenter*,
247 Cal. App. 4th 1268 (2016) ....................10

*Kingsley v. Price*,
163 A.D.3d 157 (N.Y. App. Div. 2018) ....................21

*Kirch v. Embarq Mgmt. Co.*,
702 F.3d 1245 (10th Cir. 2012) ....................7

*Klimas v. Comcast Cable Commc'ns, Inc.*,
465 F.3d 271 (6th Cir. 2006) ....................11

*Kurowski v. Rush Sys. For Health*,
659 F. Supp. 3d 931 (N.D. Ill. 2023) ....................13, 23

*Leocal v. Ashcroft*,
543 U.S. 1 (2004) ....................18

*Mount v. PulsePoint, Inc.*,
2016 WL 5080131 (S.D.N.Y. Aug. 17, 2016) ....................22, 25

*Murphy v. Thomas Jefferson Univ. Hosps., Inc.*,
2023 WL 7017734 (E.D. Pa. Oct. 10, 2023) ....................12

*Nguyen v. Abbott Lab'ys, Inc.*,
2025 WL 2299753 (N.D. Ill. Aug. 8, 2025) ....................12

*In re Nickelodeon Consumer Priv. Litig.*,
2014 WL 3012873 (D.N.J. July 2, 2014) ....................26

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016) ....................2, 3, 8

*Nienaber v. Overlake Hosp. Med. Ctr.*,
733 F. Supp. 3d 1072 (W.D. Wash. 2024) ....................16

*Pena v. GameStop, Inc.*,
670 F. Supp. 3d 1112 (S.D. Cal. 2023) ....................16

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ....................2

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) ....................23

*In re Practicefirst Data Breach Litig.*,
2022 WL 354544 (W.D.N.Y. Feb. 2, 2022) ....................22, 23

*Rodriguez v. FastMed Urgent Care, P.C.*,
741 F. Supp. 3d 352 (E.D.N.C. 2024)....................15

*Rojas-Lozano v. Google, Inc.*,
159 F. Supp. 3d 1101 (N.D. Cal. 2016)....................3

*Rolon v. Henneman*,
517 F.3d 140 (2d Cir. 2008)....................6

*Santoro v. Tower Health*,
2024 WL 1773371 (E.D. Pa. Apr. 24, 2024)....................26

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017), *aff'd*,
745 F. App'x 8 (9th Cir. 2018)....................13

*Smith v. Railworks Corp.*,
2011 WL 2016293 (S.D.N.Y. May 17, 2011)....................19

*Solomon v. Flipps Media, Inc.*,
136 F.4th 41 (2d Cir. 2025)....................11, 12

*Sussman v. Am. Broad. Cos.*,
186 F.3d 1200 (9th Cir. 1999)....................14

*T.D. v. Piedmont Healthcare*,
2024 WL 3972984 (N.D. Ga. Aug. 28, 2024)....................23

*Taylor v. N.Y. Life. Ins. Co.*,
2021 WL 467127 (S.D.N.Y. Feb. 9, 2021)....................19

*Taylor v. UKG, Inc.*,
693 F. Supp. 3d 87 (D. Mass. 2023)....................22

*Valentine v. Wideopen W. Fin., LLC*,
2013 WL 5423846 (N.D. Ill. Sep. 27, 2013)....................7

*Vita v. New England Baptist Hosp.*,
243 N.E.3d 1185 (Mass. 2024)....................18

*Webb v. Injured Workers Pharmacy, LLC*,
2023 WL 5938606 (D. Mass. Sep. 12, 2023)....................20

*Xu v. Reuters News & Media Inc.*,
2025 WL 488501 (S.D.N.Y. Feb. 13, 2025)....................10, 11

*Ziboukh v. Whaleco, Inc.*,
795 F.Supp.3d 349 (E.D.N.Y. 2025) ....................22

*In re Zynga Priv. Litig.*,
750 F.3d 1098 (9th Cir. 2014) ....................17, 18

**Statutes**

18 U.S.C. § 2511(4) ....................18

18 U.S.C. § 2520....................6, 7

18 U.S.C. § 2520(a) ....................7

42 U.S.C. § 1320d(6) ....................9, 10

42 U.S.C. § 1320d(6)(a)(3) ....................17

Electronic Communications Privacy Act of 1986, Pub. L. No. 99-508, §
101(b)(2), 100 Stat. 1848, 1850 (1986) ....................6, 17, 18

Federal Wiretap Act .................... *passim*

Health Insurance Portability and Accountability Act .................... *passim*

Video Privacy Protection Act ....................11

**Other Authorities**

Crystal Run Healthcare
www.crystalrunhealthcare.com....................3

Crystal Run, Patient Portal
https://www.crystalrunhealthcare.com/patient-portal#main-content....................3

Fed. R. Evid. 201(b)....................4

GSA, Digital Analytics Program
https://analytics.usa.gov/about....................3

U.S. District Court Southern District of New York,
https://www.nysd.uscourts.gov/....................3

## INTRODUCTION

Plaintiffs in this action seek to impose sweeping liability based on Defendants Crystal Run Healthcare Physicians, LLP's and Crystal Run Ambulatory Surgery Center of Middletown, LLC's (collectively, "Crystal Run") use of website technologies that are ubiquitous across the modern internet. The Second Amended Complaint ("SAC"), Dkt. No. 19, challenges Crystal Run's use of these commonplace technologies on the public-facing portions of its website. Plaintiffs do not allege that any confidential medical records, test results, or treatment information were transmitted to third-party technology providers by the use of these technologies. Instead, the SAC alleges, at most, that Plaintiffs visited publicly accessible webpages and that certain technical data associated with those visits—such as URLs, IP addresses, or device identifiers—was transmitted to third parties. From these allegations, Plaintiffs attempt to transform routine website functionality into violations of the federal Wiretap Act and state law.

That theory of liability fails as a matter of law. Plaintiffs' Wiretap Act claim should be dismissed for multiple, independent reasons. First, the Act does not permit civil liability based on aiding-and-abetting or "procurement" theories. Second, it instead bars claims where, as here, the alleged communications involved Crystal Run or the technology providers, which also consented to the transmission of data related to activity on the Website. Plaintiffs cannot escape this conclusion by arguing that an exception to party consent, the "crime-tort" exception, applies. The SAC does not plausibly allege that Crystal Run violated the law, implemented website technologies for the purpose of committing unlawful acts, or committed any independent crime or tort. And third, Plaintiffs do not allege facts showing that Crystal Run intercepted the contents of any communications within the meaning of the statute. Courts have repeatedly held that allegations involving the transmission of basic website activity data—like URLs, IP addresses, or

device identifiers—do not state a claim under the Wiretap Act.

Plaintiffs' common-law claims are equally deficient. Plaintiffs do not allege facts establishing the formation of an implied contract, the existence of a fiduciary or confidential relationship, or any cognizable damages. Their unjust enrichment claim—premised on the abstract value of general website activity data—likewise fails as a matter of law.

The SAC rests on a theory that would expose healthcare providers and countless other entities to criminal and civil liability for using standard website technologies on public webpages. Because Plaintiffs fail to plausibly state any claim for relief, the Court should dismiss the SAC with prejudice.

## BACKGROUND

### A. The Internet

Central to this case is the process for making a website appear on a visitor's browser. *See* SAC ¶¶ 17–21. "When a person uses a web browser to access a website, the browser sends a 'GET' request to the server hosting that site." *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 268 (3d Cir. 2016). The server with the website "source code," SAC ¶ 20, then sends directions back to the user's web browser on how to generate the webpage. Those instructions direct an "assemblage of content from multiple [other] servers hosted by [third] parties." *See In re Nickelodeon*, 827 F.3d at 268. Thus, although webpages "appear on browsers as integrated collages of text and images," the "content is delivered and aggregated from multiple independent servers" from different parties. *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 130 (3d Cir. 2015).

Third parties are involved at every stage of this process, including rendering fonts and images on a webpage, *see Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1155–56 (9th Cir. 2007), displaying advertisements, *see In re Google*, 806 F.3d at 130, and determining whether a

website visitor is a real person through CAPTCHA technology, *see Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101, 1106–07 (N.D. Cal. 2016). Third parties also provide website analytics technologies, which are used across industries, organizations, and state and federal government. *See In re Nickelodeon*, 827 F.3d at 268. U.S. government agencies, for example, are required to implement Google Analytics technology to collect data across more than 5,000 government websites—including the websites of the U.S. Department of Health and Human Services and the Veterans Health Administration.[1] The same is true of this Court's website.[2]

Plaintiffs' SAC focuses on two such commonplace technologies: DoubleClick and The Trade Desk ("Website Technologies"). *See* SAC ¶¶ 1, 3, 24–25, 39–41, 57, 72–73, 108, 124. DoubleClick allegedly sends information to Google LLC ("Google"), and The Trade Desk allegedly sends information to The Trade Desk, Inc. (collectively, "Technology Vendors"). *See id.* ¶¶ 27, 42. Crystal Run allegedly uses the Website Technologies to improve Website analytics and internet advertising. *E.g.*, *id.* ¶¶ 35–36, 60, 76, 108, 112, 120, 124.

**B. Crystal Run's Website**

Crystal Run is a multi-specialty physician group based in the New York Hudson Valley region. *Id.* ¶¶ 2, 96. Crystal Run operates the website www.crystalrunhealthcare.com (the "Website"), *id.* ¶¶ 1, 11, which can be accessed by anyone, anywhere. Separate from the Website is a password protected patient portal provided by a third party, Epic, which—after a patient logs in—enables them to refill prescriptions, schedule appointments, view test results, and access other information about the care they have received.[3]

---

[1] *See* GSA, Digital Analytics Program, https://analytics.usa.gov/about [https://perma.cc/G5MR-LTVS] (last visited Apr. 29, 2026).
[2] *See* U.S. District Court Southern District of New York, https://www.nysd.uscourts.gov/ [https://perma.cc/5Y9P-2ZNT] (last visited Apr. 29, 2026).
[3] *See* Crystal Run, Patient Portal, https://www.crystalrunhealthcare.com/patient-portal#main-content [https://perma.cc/D3JJ-VG48] (last visited Apr. 29, 2026).

Notably, Plaintiffs do not allege that the Website Technologies operate inside the patient portal or any other password-protected portion of the Website. *Id.* ¶¶ 62–70. Plaintiffs instead claim, at most, that the Website Technologies operate on the public pages of the Website that anyone can visit, such as physician profile pages, *id.* ¶¶ 62–63, "the Website's general search bar," *id.* ¶ 69, and the bill payment page. *Id.* ¶ 66. For each of these, Plaintiffs do not allege that the Website Technologies are transmitting any user-inputted identifying information in forms or fields, or that the Website Technologies are transmitting medical records, test results, or prescription information. *See id.* ¶ 62–71.

Website visitors can access Crystal Run's Privacy Policy hyperlinked at the bottom of each page. The Privacy Policy notifies Website visitors that the data that may be collected from their online activity includes "information that is automatically provided to us or collected through your use of our Online Services (collectively, 'Information')." Ahuja Decl. Ex. 1, at 3.[4] The Privacy Policy then discloses that the Website uses the Website Technologies:

> The Company may use various technologies, including cookies, tokens, tags, web logs, web beacons, scripts, and web server logs to gather automatically collected information . . . . This information may include demographic data, technical information about the technology (e.g., phone, computer) you use to connect to the Online Services, web browser information, your IP address, and browsing behavior such as pages visited and how often they are visited.

---

[4] Defendants request that the Court take judicial notice of the Privacy Policy. "The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)). Under this Rule, the Court may take judicial notice of a webpage that is publicly-available and its authenticity is determinable and not subject to dispute. *Wells Fargo Bank, N.A., Wrights Mill Holdings, LLC,* 127 F. Supp. 3d 156, 166–67 (S.D.N.Y. 2015) (finding that the court may take judicial notice of "information publicly announced on certain non-governmental websites, such as a party's official website" (citation omitted)); *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006). The Privacy Policy is a publicly-available webpage hyperlinked at the bottom of each of the publicly-available webpages on the Defendants' official Website. Its accuracy is determinable and not reasonably subject to a factual dispute, as any Website user can access it at any time.

*Id.* at 7. Finally, the Privacy Policy alerts Website visitors about the third-party Technology Vendors, stating "[w]e may also allow third parties to use cookies and other technologies to collect Activity Information and to track browsing activity over time and across third-party websites." *Id.*

### C. Plaintiffs and This Litigation

Across the entire SAC, the named Plaintiffs appear in just four paragraphs. SAC ¶¶ 7, 8, 91, 92. They both allege that they used the "Find a Doctor" feature, navigated to medical specialty webpages, requested a new patient appointment, and ran searches on the Website search bar. *Id.* ¶¶ 91–92. Plaintiff Loesel also claims to have "request[ed] a callback," *id.* ¶ 91, while Plaintiff Turiano supposedly "searched for a location," *id.* ¶ 92, on the Website. Nowhere do Plaintiffs allege their medical records or treatment data was transmitted to third parties. Plaintiffs only claim that the Website Technologies sent data about viewed webpages, button clicks, search terms, device identifiers, IP addresses, and timestamps. *Id.* ¶¶ 4, 62–71. In addition, Plaintiffs do not claim to have Google accounts, much less to have been logged into those accounts while they visited the Website.

Based on these allegations, Plaintiffs assert claims under the federal Wiretap Act and state law on behalf of a proposed nationwide class of current and former Crystal Run Website users whose information was allegedly transmitted to the Technology Vendors. *Id.* ¶ 94.

## LEGAL STANDARD

To survive a motion to dismiss, Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 570 (2007). This requires more than "naked assertions devoid of further factual enhancements." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The Court is also not "bound to accept conclusory allegations or legal

conclusions masquerading as factual conclusions." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008)).

## ARGUMENT

### I. Plaintiffs' Claims Under the Wiretap Act Should Be Dismissed

Passed in 1968, the federal Wiretap Act (the "Act" or "Wiretap Act") took its current form when it was amended by the Electronic Communications Privacy Act in 1986, several years before the advent of the internet. *See* Electronic Communications Privacy Act of 1986, Pub. L. No. 99-508, § 101(b)(2), 100 Stat. 1848, 1850 (1986). The Act is a criminal statute, but provides a civil cause of action against persons or entities that "intercepted, disclosed, or intentionally used" another's electronic communications "in violation of" the Act. 18 U.S.C. § 2520. "Intercept" is defined as "the aural or other acquisition of the ***contents*** of any . . . electronic . . . communication through the use of any electronic, mechanical, or other device." *Id.* § 2510(4) (emphasis added). The section of the statute outlining criminal liability states that "any person" who "procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication" is subject to criminal punishment. *Id.* § 2511(1). There is also a critical limitation on liability under the statute: no violation occurs when the intercepting party is either "a party to the communication" or "where one of the parties to the communication has given prior consent to such interception," unless the "communication is intercepted for the purpose of committing any criminal or tortious act" in violation of federal or state law. *Id*. § 2511(2)(d).

Plaintiffs fail to state a Wiretap Act claim because (i) Plaintiffs' aiding and abetting theory of liability is not permitted under the Act; (ii) Plaintiffs cannot avoid the single-party consent limitation on liability, and the "crime-tort exception" is inapplicable; and (iii) Plaintiffs fail to allege facts showing that the contents of any communications were intercepted.

### A. The Wiretap Act Does Not Impose Aiding-and-Abetting Liability

Plaintiffs' Wiretap Act claim is based on Crystal Run having allegedly "procured" the Technology Vendors to "intercept" the communications of visitors to the Website. SAC ¶¶ 75, 77, 108–09. This theory of liability misses the mark because the Act's "procurement" provision pertains only to criminal liability, ***not*** civil liability. *Compare* 18 U.S.C. § 2520(a) ("[A]ny person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity . . . which engaged in that violation."), *with id.* § 2511(1)(a) ("[A]ny person who . . . intentionally intercepts, endeavors to intercept, or ***procures*** any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication . . . shall be punished.") (emphasis added). The Wiretap Act only permits private civil actions against individuals who engage in prohibited interceptions, disclosures, or uses; it does ***not*** permit civil claims against those who engage in alleged "procure[ment]." *Id.* § 2520.

Based on this statutory language, courts refuse to "implicitly read secondary liability into the statute," *Freeman v. DirecTV, Inc.*, 457 F.3d 1001, 1006 (9th Cir. 2006) (citation omitted), and hold that there is no indirect civil liability under Wiretap Act, *see Kirch v. Embarq Mgmt. Co.*, 702 F.3d 1245, 1246–47 (10th Cir. 2012); *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1089 (N.D. Cal. 2015); *Valentine v. Wideopen W. Fin., LLC*, 2013 WL 5423846, at *6 (N.D. Ill. Sep. 27, 2013); *Crowley v. CyberSource Corp.*, 166 F. Supp. 2d 1263, 1269 (N.D. Cal. 2001). As one court in this Circuit recently underscored, "there is no secondary civil liability under the Federal Wiretap Act." *Joiner v. NHL Enters., Inc.*, 2025 WL 2846431, at *7 n.6 (S.D.N.Y. Aug. 29, 2025), *R. & R. adopted in relevant part*, 2025 WL 3126106 (S.D.N.Y. Sep. 29, 2025).

Plaintiffs' theory of liability also flounders because the allegations in the SAC do not show that the Technology Vendors "intercept" any communications as third-party eavesdroppers. When

Plaintiffs allegedly interacted with the Website, their browsers directly communicated with the Technology Vendors, *see In re DoubleClick Privacy Litig.*, 154 F. Supp. 2d 497, 503–04 (S.D.N.Y. 2001) (describing how DoubleClick technology involves interactions between website visitors' browsers and DoubleClick servers); SAC ¶¶ 18–20, 26–27, 42, and thus the latter were direct parties to these communications, *Cole v. Quest Diagnostics Inc.*, 2025 WL 3172640, at *2–3 (3d Cir. Nov. 13, 2025) (technology provider was a "participant" in the communications "even if done without the users' knowledge" (citation omitted)).

Without a viable theory of liability, Plaintiffs' claim fails as a matter of law.[5]

**B. The Crime-Tort Exception to Party Consent Is Not Applicable**

Both Crystal Run and the Technology Vendors were parties to Plaintiffs' alleged communications with the Website, and they consented to the data transmissions that Plaintiffs allege occurred between their browsers and the Technology Vendors' servers. *See* SAC ¶¶ 18, 26; *In re DoubleClick*, 154 F. Supp. 2d at 504–05 (explaining operation of similar website technologies). That means the purported interceptions of Website activity data fall well within the one-party consent limitation under the Wiretap Act. *See In re Nickelodeon*, 827 F.3d at 274. Plaintiffs recognize as much, *see* SAC ¶ 113, and pivot to argue that Crystal Run's use of the Website Technologies falls under the "crime-tort exception" because the alleged interceptions were supposedly done for the "purpose" of violating the Health Insurance Portability and Accountability Act ("HIPAA") and invading Website visitors' privacy. *Id.*

But for the crime-tort exception to apply, Plaintiffs must show that: (i) Crystal Run

[5] In one paragraph of the SAC, Plaintiffs suggest that Crystal Run allegedly "used" or "endeavor[ed] to use" the "contents" of communications that were illegally intercepted. SAC ¶ 110. This stray allegation does not help Plaintiffs because they have not alleged facts showing any unlawful interception, *see supra* pp. 7–8, or that Crystal Run used or tried to use the "contents" of any supposedly intercepted communications. References to "advertising and analytics purposes," SAC ¶ 112, does not plausibly show any such use or attempted use.

committed an underlying HIPAA violation and invasion of privacy, (ii) Crystal Run's "primary motivation" or "a determinative factor in [Crystal Run's] motivation for intercepting the conversation was to" violate HIPAA and to invade Plaintiffs' privacy, *In re DoubleClick*, 154 F. Supp. 2d at 514–15 (citation omitted), and (iii) the interception was intended to be used for "a crime or tort independent of the act of the recording itself," *Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010). Plaintiffs cannot satisfy any of these requirements.

1. Crystal Run's Alleged Use of Website Technologies on Public Webpages Did Not Violate HIPAA and Constitute an Invasion of Privacy

As a threshold matter, Plaintiffs fail to allege facts showing that Crystal Run violated HIPAA and invaded Website visitors' privacy. HIPAA prohibits covered entities from ***knowingly*** disclosing "individually identifiable health information" ("IIHI") without authorization or an applicable exception. 42 U.S.C. § 1320d(6). To be IIHI, information must (i) "relate[] to" an individual's health condition, health care, or payment for health care; and (ii) "identif[y] the individual" or provide "a reasonable basis to believe that the information can be used to identify the individual." *Id.* Plaintiffs assert that the transmission of IP addresses, device identifiers, and URLs reflecting webpages visitors navigated and searches they ran violates HIPAA, citing guidance from the U.S. Department of Health and Human Services' Office for Civil Rights ("OCR"). SAC ¶¶ 30–60.

However, as the court in *American Hospital Association v. Becerra*, 738 F. Supp. 3d 780 (N.D. Tex. 2024), held, data captured about browsing activity on public portions of a healthcare provider's website, by itself, does not constitute IIHI. In so holding, the court reviewed OCR guidance that made the same interpretative leap that Plaintiffs proffer here—i.e., that "(1) an individual's IP address" combined with data about "(2) a visit to a [unauthenticated public webpage] addressing specific health conditions or healthcare providers," described as the

"proscribed combination"—amounts to IIHI. *Id.* at 789. *Becerra* first held that OCR's "proscribed combination" was not necessarily IIHI because whether the data "relates" to an individual's health, the provision of healthcare, or payment for healthcare turns on why the person visited the website. *Id.* at 801–02. The court noted that "[t]here are many ***generic*** reasons why [individuals] may have visited such pages, entirely unrelated to the health, healthcare, or payment for healthcare of any particular individual (*e.g.*, they could be public-health researchers or hospital employees);" it is not enough that the information "***may*** relate to" or "***might*** relate to" a user's medical conditions. *Id.* (citing 42 U.S.C § 1320d(6)). *Becerra* next held that OCR's "proscribed combination" was not IIHI because "IIHI is limited to information that is related to a specific person's health and [is] reasonably capable of being used to identify ***that person***," and the combined data at issue "does not, in itself, 'identify' the individual searcher and their condition." *Id.* at 802. Rather, this again requires the website provider to know the visitor's subjective intent for their visit or search: "[s]imply put, **Identity** (Person A) **+ Query** (Condition B) **≠ IIHI** (Person A has Condition B)." *Id.* at 803.

The same is true here, as Plaintiffs fail to satisfy either the "relates to" or "identifies" IIHI definitional prongs. ***First***, Plaintiffs fail to allege that Crystal Run disclosed any personally identifying information to satisfy IIHI's "identifies" prong. Plaintiffs do not allege that Crystal Run collected or disclosed their name, email, or any other individually identifying information. Instead, Plaintiffs contend that their device IP addresses are personally identifying information. SAC ¶ 29. But a device's IP address is *not* personally identifying information. *See Xu v. Reuters News & Media Inc.*, 2025 WL 488501, at *3 (S.D.N.Y. Feb. 13, 2025) (alleged collection of device IP address does not implicate "personally identifying information"). "IP address standing alone . . . is nothing more than a string of 'four sets of numbers separated by periods.'" *Kinda v.*

*Carpenter*, 247 Cal. App. 4th 1268, 1280 (2016) (citation omitted); *see also* SAC ¶ 30. It "identifies a computer, rather than a specific user of a computer." *Columbia Pictures Indus. v. Bunnell*, 2007 WL 2080419, at *12 (C.D. Cal. May 29, 2007). For this reason, device "IP addresses do not in and of themselves reveal 'a [visitor's] name [or] address[.]'"[6] *Klimas v. Comcast Cable Commc'ns, Inc.*, 465 F.3d 271, 276 n.2 (6th Cir. 2006). In fact, "[m]ost consumer IP addresses are 'dynamic'" meaning that they "are randomly assigned to internet users and change frequently," as "a single IP address may be re-assigned to many different computers in a short period of time." *Call of the Wild Movie, LLC v. Does 1–1,062*, 770 F. Supp. 2d 332, 356–57 (D.D.C. 2011) (citation omitted). In other words, it is basic "information 'voluntarily conveyed' by an internet user, to a third party, in order to direct its servers." *Xu*, 2025 WL 488501, at *5.

Likewise, cookies and other device identifiers are not alone personally identifying. Cookies are simply small text files that include alphanumeric strings that are used to identify a particular browser, "much akin to computer bar-codes or identification numbers placed on 'business reply cards' found in magazines." *In re DoubleClick*, F. Supp. 2d at 513. "To an average person, an IP address or a digital code in a cookie file would likely be of little help in trying to identify an actual person." *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 55 (2d Cir. 2025) (citation omitted). Similarly, device identifiers—as their name suggest—"only identify devices, not particular individuals." *Afriyie v. NBCUniversal Media, LLC*, 775 F.Supp.3d 791, 809 (S.D.N.Y. 2025). "[W]ithout more information, such as a name or an address, . . . the device remains anonymous—a nameless and faceless device among a million others." *Id.* (finding device identifiers not to be "personally identifying information" under the Video Privacy Protection Act).

---

[6] Only the internet user's Internet Service Provider ("ISP") could potentially link a particular device's IP address to an individual subscriber. *See In Re Charter Commc'ns, Inc., Subpoena Enf't Matter*, 393 F.3d 771, 774 (8th Cir. 2005). Crystal Run is ***not*** an ISP. *See BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 299 (4th Cir. 2018) ("[O]nly the ISP can match the IP address to the subscriber's identity.").

For these reasons, the Second Circuit concluded in *Solomon* that cookies and device identifiers do not amount to "personally identifiable information" under the Video Privacy Protection Act. 136 F.4th at 55.

Because IP addresses, cookies, and device identifiers cannot alone be used to personally identify a website visitor, Plaintiffs' browsing activity associated with such information is not IIHI.

***Second***, Plaintiffs' alleged browsing activity on Crystal Run's public Website does not "relate to" a specific individual's health condition, health care, or payment for health care without knowledge of Plaintiffs' subjective intent when using the Website. Plaintiffs do ***not*** allege that the Website Technologies were deployed behind Crystal Run's patient portal and that these Technologies transmitted actual medical records to third parties. Instead, Plaintiffs assert in conclusory fashion that they visited the Website's unauthenticated public pages to use the "Find the Doctor" feature, request a new patient appointment form, request a call back, and conduct unspecified searches. *See* SAC ¶¶ 91–92. Crystal Run thus has no way to know the purpose of Plaintiffs' browsing activity or searches and whether each relates to ***their*** specific medical conditions or health care, a third party's medical condition, research about a condition or care generally, or was undertaken for some other reason. As *Becerra* makes clear, such unidentified browsing activity is not IIHI. *See* 738 F. Supp. 3d at 801–07.

Courts across the country hold that alleged transmission of similar types of data is insufficient to invoke the crime-tort exception. *E.g., Harrill v. Emanuel Med. Ctr.*, 2025 WL 1635428, at *4 (E.D. Cal. June 9, 2025); *Nguyen v. Abbott Lab'ys, Inc.*, 2025 WL 2299753, at *5 (N.D. Ill. Aug. 8, 2025); *Hannant v. Culbertson*, 2025 WL 2413894, at *4–5 (C.D. Ill. Aug. 20, 2025). That is especially true when there are no allegations that "any specific test results, diagnoses, or sensitive messages were intercepted or improperly disclosed." *Murphy v. Thomas*

*Jefferson Univ. Hosps., Inc.*, 2023 WL 7017734, at *3 (E.D. Pa. Oct. 10, 2023); *see also K.L. v. Legacy Health*, 2024 WL 4794657, at *4 (D. Or. Nov. 14, 2024) ("[G]eneric search queries created during . . . browsing activity [on unauthenticated healthcare provider website] . . . do not constitute [IIHI]."); *Kurowski v. Rush Sys. For Health*, 659 F. Supp. 3d 931, 935–36, 938 (N.D. Ill. 2023) (alleged disclosure of IP addresses and browsing activity did not "support an inference that [the defendant] disclosed its patients' [IIHI]"); *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 954–55 (N.D. Cal. 2017) (rejecting argument that HIPAA applied to plaintiff's searches of medical conditions because the "pages contain general health information that is accessible to the public at large" and those do not relate to the plaintiff's "past, present, or future" medical conditions (citation omitted)), *aff'd*, 745 F. App'x 8 (9th Cir. 2018).

Thus, Plaintiffs have not demonstrated a predicate violation of law to support application of the crime-tort exception.

2. Plaintiffs Fail to Show Crystal Run Intended to Violate HIPAA and Invade Plaintiffs' Privacy

The crime-tort exception does not apply to this case for another reason: Plaintiffs fail to allege facts showing that Crystal Run's purpose in implementing the Website Technologies was to transmit data in violation of HIPAA and invade Plaintiffs' privacy.

To establish criminal or tortious purpose, courts have long held that the plaintiff must demonstrate "either (1) that the primary motivation, or (2) that a determinative factor in the actor's . . . motivation for intercepting the conversation was to commit a criminal[,] tortious . . . act." *In re DoubleClick*, 154 F. Supp. 2d at 514–15 (citation omitted). "Purpose and knowledge are the most culpable levels in the criminal law's mental-state 'hierarchy.'" *Borden v. United States*, 593 U.S. 420, 426 (2021) (citation omitted). "A person acts purposefully when he 'consciously desires' a particular result." *Id*. (citation omitted). As a result, "the offender" must "have as her

objective a tortious or criminal result" or "deliberately seek[] to harm the other participant through the information intercepted." *Caro*, 618 F.3d at 100. Section 2511(2)(d)'s legislative history and case law make clear that the "criminal" or "tortious" purpose requirement is to be construed narrowly, covering only acts accompanied by a specific contemporary intention to commit a crime or tort. *In re DoubleClick*, 154 F. Supp. 2d. at 515.

Consistent with the crime-tort exception's narrow application, "[i]ntent may not be inferred simply by demonstrating that the intentional act of recording itself constituted a tort." *Caro*, 618 F.3d at 100. Rather, "the offender must have as her objective a tortious or criminal result." *Id*. "[T]he focus is not upon whether the interception itself violated another law; [but rather,] whether the purpose for interception—its intended use—was criminal or tortious[.]" *In re DoubleClick*, 154 F. Supp. 2d. at 516 (quoting *Sussman v. Am. Broad. Cos.*, 186 F.3d 1200, 1202–03 (9th Cir. 1999)). A "'tortious purpose' [does not] exists wherever an intentional action is later determined to have constituted a tort[.]" *Id*. at 517.

Accordingly, Plaintiffs must not only establish that Crystal Run's use of the Website Technologies violates HIPAA and invades their privacy—which, as detailed above, *supra* § I.B.1, they cannot—and they must also allege sufficient facts to plausibly show that Crystal Run did so with the express ***purpose*** of violating HIPAA and invading Plaintiffs' privacy. Plaintiffs fail to do so.

Far from evincing an intent to knowingly violate HIPAA and invade Plaintiffs' privacy, Crystal Run allegedly installed the Website Technologies on public-facing webpages, which anyone can access. Plaintiffs do not allege that any Website Technologies operated within Crystal Run's patient portal. Plaintiffs also allege that Crystal Run implemented the Website Technologies for advertising and commercial purposes, SAC ¶¶ 75–76, but that alone is not a crime or tort. This

is a far cry from the purpose of the crime-tort exception, which is "confined to instances where the recording party intends to use the recording to harm or injure a recorded party, such as to blackmail, threaten, or publicly embarrass the recorded party." *Cohen v. Casper Sleep Inc.*, 2018 WL 3392877, at *3 (S.D.N.Y. July 12, 2018) (citation omitted). Tellingly, Plaintiffs cite no authority suggesting that the federal government has ever pursued criminal charges under HIPAA or the Wiretap Act based on transmission of browsing data on healthcare websites.[7] Plaintiffs' allegations here are akin to *In re DoubleClick*, where the court—when analyzing one of the same technologies at issue here—found that DoubleClick's purpose "has plainly not been to perpetuate torts on millions of Internet users, but to make money by providing a valued service to" websites. 154 F. Supp. 2d at 519 (rejecting crime-tort exception premised on alleged torts caused by use of DoubleClick).

So too here. And other courts agree, holding that the alleged transmission of browsing data associated with healthcare websites does not satisfy the core purpose requirement of the crime-tort exception. *E.g.*, *Doe v. Genesis Health Sys.*, 2025 WL 1000192, at *9 (C.D. Ill. Mar. 18, 2025) (rejecting application of crime-tort exception where plaintiffs' allegations concerned use of web technologies for "marketing and advertising purposes, not ***for the purpose of*** knowingly committing a violation of the HIPAA") (citation omitted); *Goulart v. Cape Cod Healthcare*, 2025 WL 1745732, at *3–4 (D. Mass. June 24, 2025) (similar); *Doe v. Kaiser Found. Health Plan, Inc.*, 2024 WL 1589982, at *10 (N.D. Cal. Apr. 11, 2024) (similar); *Rodriguez v. FastMed Urgent Care, P.C.*, 741 F. Supp. 3d 352, 364 (E.D.N.C. 2024) (similar).

[7] Plaintiffs also do not cite any authority suggesting that Congress intended for the Wiretap Act to be an end-run around the lack of a private right of action in HIPAA. *See Doe v. Lawrence Gen. Hosp.*, 2025 WL 2808055, at *16 n.11 (D. Mass. Aug. 29, 2025) ("[I]f the 'purpose' element of [the Wiretap Act] could be satisfied merely by showing that a website operator knowingly used web tools that share information with Google or Meta, then [the Act] would provide just such a private right of action based on nothing beyond the mere 'knowingly' requirement for the HIPAA misdemeanor."), *R&R adopted in relevant part*, 2025 WL 2807673 (D. Mass. Sep. 30, 2025).

3. Plaintiffs Fail to Allege a Separate and Independent Crime or Tort

Plaintiffs' crime-tort exception theory further fails because they do not allege that the supposed criminal or tortious act was separate from the initial alleged interception. "[T]o survive a motion to dismiss, a plaintiff must plead sufficient facts to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is ***independent*** of the intentional act of recording." *Caro*, 618 F.3d at 100. Stated differently, the "criminal or tortious acts . . . [must be] secondary to the acquisition of the communication involving tortious or criminal use of the interception's fruits." *In re Google Cookie Placement*, 806 F.3d at 145 (citation omitted).

Here, the alleged interception and tort or crime are one in the same: the purported transmission of data concerning Plaintiffs' browsing activity on the Website to the Technology Vendors. *See* SAC ¶ 113. Plaintiffs fail to allege any separate and independent secondary crime or tort involving the interception's fruits. As other courts have explained, "the act of interception itself cannot be the crime or the tort." *Kaiser Found. Health Plan*, 2024 WL 1589982, at *10 (finding that the alleged HIPAA violation premised on use of tracking technologies was not an independent crime or tort); *Goulart*, 2025 WL 1745732, at *4 n.3 (crime-tort exception inapplicable where "allegations that [defendant] violated HIPAA and various torts encompass only the simultaneous interception and disclosure of information to Facebook and Google"); *Nienaber v. Overlake Hosp. Med. Ctr.*, 733 F. Supp. 3d 1072, 1095–96 (W.D. Wash. 2024) (similar); *see also Pena v. GameStop, Inc.*, 670 F. Supp. 3d 1112, 1115 (S.D. Cal. 2023) (crime-tort exception is not triggered when "the tortious conduct is the alleged wiretapping itself" (citation omitted)).

The analysis in this case mirrors the Second Circuit's reasoning in *Caro*. There, like here, the plaintiff premised his invocation of the crime-tort exception on the defendant's alleged tortious invasion of privacy. *Caro*, 618 F.3d at 100. But, because the invasion of privacy tort "occurs

through the act of the interception," and "[n]othing more is required after the interception" for liability to attach, the alleged invasion of privacy could not satisfy the Wiretap Act's "requirement of a separate and independent tortious intent." *Id*. at 101 (affirming dismissal of Wiretap Act claim). Here too, Plaintiffs' reliance on an invasion of privacy tort likewise fails. And because a HIPAA violation occurs as soon as a covered entity "discloses [IIHI]" without authorization, *see* 42 U.S.C. § 1320d(6)(a)(3), the purported HIPAA violation accrues "through the act of the interception," and "[n]othing more is required after the interception" for liability to attach. *Caro*, 618 F.3d at 100–01. Plaintiffs therefore fail to allege that the intercepted data was used to commit a "separate and independent" crime or tort, and their ECPA claim should be dismissed.

### C. Plaintiffs Fail to Allege that the "Contents" of Any Communications Were Intercepted

Finally, Plaintiffs' vague allegations about their interactions with the Website fail to show that the "contents" of any of ***their*** communications were "intercepted." The law is clear that "record" information like names, addresses, subscriber entities, or characteristics of a communication—such as IP addresses or ID numbers—are not contents. *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014) (dismissing an ECPA claim for failure to plausibly allege that defendants divulged the "contents" of a communication). Instead, "contents" refers "to the intended message conveyed by the communication." *Id.* Plaintiffs' allegations that they used certain website features and conducted unspecified searches do not show that the substantive message of any communication they had with the Website was transmitted to a third party. SAC ¶¶ 91–92. Moreover, even if searches in URLs were allegedly disclosed, courts hold that basic website browsing activity is record information, not contents. *E.g.*, *In re Zynga Priv. Litig.*, 750 F.3d at 1106–10 (affirming ECPA dismissal for failing to plead "contents" when plaintiffs only pled that automatically transmitted information, including URLs, was shared); *Gonzales v. Uber*

*Techs., Inc.*, 305 F. Supp. 3d 1078, 1085–86 (N.D. Cal. 2018) (dismissing ECPA claim and rejecting interpretation of "contents" that would include "information as to the webpage the user was viewing").

Plaintiffs cannot fall back on allegations in the SAC about what the Website Technologies supposedly do in various hypothetical scenarios. The activities of a "hypothetical" visitor do not establish "what information" ***Plaintiffs*** "provided to Defendant, via their browsing activity," which was allegedly "disclosed" to a third party. *Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1123 (S.D. Cal. 2023) (holding that referencing disclosures of hypothetical "medical test results," "payment information," and "messages with doctors" was insufficient because they were not tied to a specific plaintiff); *see also In re Zynga Priv. Litig.*, 750 F.3d at 1106–10; *Gonzales*, 305 F. Supp. 3d at 1085–86.

While the foregoing makes clear that Plaintiffs' Wiretap Act claim fails as a matter of law, to the extent there is any ambiguity in the statute, the Rule of Lenity instructs that such ambiguity should be construed in Crystal Run's favor. The Wiretap Act is a criminal statute, *see* 18 U.S.C. § 2511(4), and therefore must be "construed strictly," as "an individual is not to be subjected to a penalty unless the words of the statute plainly impose[s] it." *Bittner v. United States*, 598 U.S. 85, 101 n.10 (2023) (Gorsuch, J., concurring) (citation omitted). That is true in this civil suit, because a penal statute must be interpreted "consistently," no matter whether it is applied "in a criminal or noncriminal context." *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) (citation omitted). Under these principles of statutory interpretation, it is even more evident that Plaintiffs' Wiretap Act claim should be dismissed. *See Vita v. New England Baptist Hosp.*, 243 N.E.3d 1185, 1205–06 (Mass. 2024) (construing Massachusetts' wiretap statute narrowly given ambiguity in statute's application to website analytics technologies); *Doe v. Eating Recovery Ctr. LLC*, 806 F. Supp. 3d 1109, 1118–

19 (N.D. Cal. 2025) (same for California's wiretap law).

## II. Choice of Law

Crystal Run assumes for the purposes of this Motion that the law of the state of New York applies to Plaintiffs' common law claims. New York uses the center of gravity choice-of-law analysis for contract-based claims. *Taylor v. N.Y. Life. Ins. Co.*, 2021 WL 467127, at *6 (S.D.N.Y. Feb. 9, 2021). Under this approach, the court considers several factors, including the location of contracting, the location of negotiation and performance, the location of the subject matter of the contract, and the domiciles of the parties. *Id.* These are fact-intensive issues, and "courts often decline to make a choice of law determination at the motion to dismiss stage." *Smith v. Railworks Corp.*, 2011 WL 2016293, at *6 n.12 (S.D.N.Y. May 17, 2011) (citation omitted). The Court can revisit the issue with a more complete factual record if the case proceeds.[8]

## III. Plaintiffs' Common Law Claims Fail as a Matter of Law

Just as Plaintiffs' allegations in the SAC do not make out a Wiretap Act claim, they fail to state any plausible common law causes of action.

### A. Plaintiffs Fail to State a Claim for Breach of Implied Contract

Plaintiffs' claim for breach of implied contract should be dismissed because the allegations in the SAC do not establish the core requirements of contract formation and damages. *Hammond v. Bank of N.Y. Mellon Corp.*, 2010 WL 2643307, at *11 (S.D.N.Y. June 25, 2010).

No Contract Formed. Plaintiffs assert that they "provided their sensitive health information and electronic communications" to Defendants, and, in exchange, Defendants supposedly "agreed to provide healthcare-related information and services and . . . to maintain the privacy and confidentiality of the sensitive data transmitted through the Website." SAC ¶¶ 116–17. These

[8] Defendants reserve the right to challenge the application of New York law if the case proceeds and it becomes clear that the laws of other states apply to the named Plaintiffs' claims or to the claims of other putative class members.

allegations fall well short of establishing the requisite mutual assent. *See Hammond*, 2010 WL 2643307, at *11 (holding that mutual assent requires a meeting of the minds "to be contractually bound"). At most, Plaintiffs point to their ***own*** belief that they formed implied contracts with Defendants "when they used the Website." SAC ¶ 115. There are no allegations in the SAC that show ***Defendants*** agreed to this alleged bargain. *See Webb v. Injured Workers Pharmacy, LLC*, 2023 WL 5938606, at *3 (D. Mass. Sep. 12, 2023) (finding plaintiff's good faith belief that their private information would be protected as insufficient because there was "no allegation that [defendant] agreed—explicitly or implicitly—to provide such protection").

Indeed, the Privacy Policy expressly contemplates the use of the Website Technologies, which further undermines Plaintiffs' assertion that there was a meeting of the minds. The Privacy Policy informs Website visitors that "[w]e may also allow third parties to use cookies and other technologies to collect Activity Information and to track browsing activity over time and across third-party websites" and that "[w]e may also share Information with other third-party companies." Ahuja Decl. Ex. 1, at 6–7. The Privacy Policy specifies how Website visitors' browsing data would be utilized, stating that it would be used in part "[t]o perform analytics" and "[t]o provide you with informational or promotional offers." *Id.* at 5. This is exactly how Plaintiffs allege Defendants used information associated with their visits to the Website. SAC ¶¶ 35–36, 60, 76, 108, 112, 120, 124. Defendants could not have assented to refrain from using the Website Technologies when they explicitly told Website visitors—like Plaintiffs—that they may be deployed and the functions they would serve.

Plaintiffs also cannot manufacture mutual assent by pointing to physician-patient relationships or the healthcare context more generally. *Id.* ¶ 118. To start, Plaintiffs' interactions were with the public pages of the Website, not a doctor or other medical provider. Plaintiffs never

allege that they logged into the patient portal, much less that the Website Technologies were embedded within the portal to intercept test results, doctor notes, and the like. *See Kingsley v. Price*, 163 A.D.3d 157, 161 (N.Y. App. Div. 2018) (finding no physician-patient relationship where the defendant did not examine or otherwise administer care to the plaintiff). Rather, Plaintiffs allegedly browsed various pages on the Website, ran search queries, and searched for facility locations—activities that anyone, anywhere could undertake. *See* SAC ¶¶ 91–92. These activities do not involve the provision or receipt of medical services. *See supra* § I.B.1; *see also Doe v. Upperline Health, Inc.*, No. 2024 WL 4953503, at *3 (S.D. Ind. Sep. 24, 2024) (ruling that using a healthcare website "to schedule appointments" and "[to] find a podiatrist" does not amount to sharing medical information). And courts routinely dismiss breach of implied contract claims on this basis. *E.g.*, *Beltran v. Drs. Med. Ctr. Of Modesto*, 2025 WL 1635467, at *6, *12 (E.D. Cal. June 9, 2025) (dismissing breach of implied contract claim in part because "generally browsing for information on health conditions, symptoms, and doctors on Defendants' Website" did not involve medical information); *Camm v. Reach Fin., LLC*, 2026 WL 861670, at *14 (S.D.N.Y. Mar. 30, 2026) (dismissing breach of implied contract claim where no employment or special relationship between the parties).

<u>No Damages</u>. Apart from mutual assent, the allegations in the SAC do not show that Plaintiffs suffered any cognizable damages to support a breach of implied contract claim, as Plaintiffs' proffered theories of harm all miss the mark. ***First***, Plaintiffs argue that they have lost the benefit of their bargain, "as they received healthcare services that were diminished in value due to the failure to provide the promised confidentiality." SAC ¶ 122. But courts routinely reject similar theories of injury, especially where, as here, Plaintiffs make no showing that they received actual medical services that were worth less than what they bargained for. *E.g.*, *Aponte v. Ne.*

*Radiology, P.C.*, 2022 WL 1556043, at *4 (S.D.N.Y. May 16, 2022) (dismissing benefit of the bargain theory of injury because plaintiffs did not allege concrete damages, even if they lost some privacy related to data shared with medical system). There are no allegations establishing that Plaintiffs received substandard medical services, or that any bargained-for medical services they received were provided through the public pages of the Website where the Website Technologies were allegedly deployed.

***Second***, Plaintiffs assert that they have lost "the economic value of their sensitive personal and health data." SAC ¶ 122. Courts, however, have repeatedly found that supposed loss of value of data does not amount to damages where there are no allegations that the plaintiffs could no longer use or monetize that data. *See Cooper v. Bonobos, Inc.*, 2022 WL 170622, at *5 (S.D.N.Y. Jan. 19, 2022) (rejecting diminution in value of personal information theory of injury); *see also In re Practicefirst Data Breach Litig.*, 2022 WL 354544, at *7 (W.D.N.Y. Feb. 2, 2022) (finding no loss of value of data injury where "plaintiffs do not allege that they attempted to sell their personal information and were forced to accept a decreased price, nor do they allege any details as to how their specific, personal information has been devalued because of the breach" (citation omitted)); *Taylor v. UKG, Inc.*, 693 F. Supp. 3d 87, 101 (D. Mass. 2023) (noting that courts consistently reject this theory of injury); *Chambliss v. CareFirst, Inc.*, 189 F. Supp. 3d 564, 572 (D. Md. 2016) ("This Court need not decide whether such personal information has a monetary value, as Plaintiffs have not alleged that they have attempted to sell their personal information." (citation omitted)). While internet browsing information "may possess value in the abstract, absent allegations suggesting that plaintiffs' ability to monetize their browsing information was diminished, this alleged harm remains too conjectural." *Mount v. PulsePoint, Inc.*, 2016 WL 5080131, at *6 (S.D.N.Y. Aug. 17, 2016); *see also Ziboukh v. Whaleco, Inc.*, 795 F.Supp.3d 349, 372 (E.D.N.Y. 2025) (finding no loss

of value of data injury when plaintiffs did not allege the sale of their data). Plaintiffs have not alleged that they ever attempted to monetize or otherwise benefit from their data, nor do they establish how their data has lost value such that they could not monetize it or use it in the future.

***Third***, Plaintiffs' invasion of privacy theory similarly fails. SAC ¶ 122. As an initial matter, Defendants did not invade Plaintiffs' privacy, as Plaintiffs allege that the Website Technologies transmitted data to third parties. *See id.* ¶ 120; *Cole v. Quest Diagnostics Inc.*, 2025 WL 3172640, at *3 (3d Cir. Nov. 13, 2025) (finding no privacy violation where plaintiffs "sen[t] a separate message to Facebook's servers . . . concurrent with the communications with [defendant]" such that "Facebook was a participant in Plaintiffs' transmissions" independent of the defendant (ellipsis in original)). Moreover, "there exist[s] no free-roaming privacy right" when browsing websites, *Popa v. Microsoft Corp.*, 153 F.4th 784, 792 (9th Cir. 2025), and as shown in Section I.B.1, *supra*, the allegations in the SAC do not show that actual medical information was allegedly transmitted to third parties. With no allegations demonstrating a highly offensive invasion into a protected space, Plaintiffs' privacy theory of harm fails. *E.g.*, *T.D. v. Piedmont Healthcare*, 2024 WL 3972984, at *3 (N.D. Ga. Aug. 28, 2024) (dismissing privacy claims because disclosure of "routine medical searches and inquiries" was not "highly offensive"); *Kurowski*, 659 F. Supp. 3d at 943–44 (finding no invasion of privacy "when [the defendant] allowed third-party source code to collect [the plaintiff's] data" on its website).

***Fourth***, Plaintiffs allege that a "chilling effect ***may*** lead to reluctance to seek needed healthcare," SAC ¶ 88 (emphasis added), and that their "health-related information ***may*** be further processed," *id.* ¶ 89 (emphasis added), but such conjecture is far too speculative to establish damages. *See In re Practicefirst Data Breach Litig.*, 2022 WL 354544, at *4–6 (finding that a generalized allegation of future data insecurity or unauthorized use was inadequate to establish

injury); *Cherny v. Emigrant Bank*, 604 F. Supp. 2d 605, 608 (S.D.N.Y. 2009) ("Courts have held . . . that the release of potentially sensitive information alone, without evidence of misuse, is insufficient to cause damage to a plaintiff."). As the Supreme Court has made clear, there must be "concrete evidence to substantiate" a plaintiffs' "fears," and the SAC contains no such evidence here. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 420 (2013).

For all these reasons, Plaintiffs' breach of implied contract claim fails as a matter of law.

### B. Plaintiffs Fail to State a Claim for Unjust Enrichment

Plaintiffs' unjust enrichment claim fares no better. As a threshold matter, Plaintiffs' unjust enrichment claim is impermissibly duplicative of their Wiretap Act and breach of implied contract claims, and must be dismissed on this ground alone. *Coresello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012) (finding that unjust enrichment "is available only in unusual situations" in which it does not duplicate another claim).[9] A claim is duplicative if it "rests on the same allegedly tortious conduct" as another claim. *Afriyie v. NBCUniversal Media, LLC*, 775 F. Supp. 3d 791, 813 (S.D.N.Y. 2025) (dismissing unjust enrichment claim as duplicative of statutory claim when it "rests on the same allegedly tortious conduct—Defendants' purported collection and disclosure of personally identifiable information and video viewing history"). That is true here, where Plaintiffs' Wiretap Act, breach of implied contract, and unjust enrichment claims are each predicated on the alleged collection and disclosure of data to the Technology Vendors, *compare* SAC ¶¶ 109, 112, *with id.* ¶¶ 97, 120, *and id.* ¶¶ 97, 123–24, and the same forms of alleged damages, including purported loss of the value of their data and invasion of privacy, *see id.* ¶¶ 80–89, 122, 126; *see also Camm*, 2026 WL 861670, at *15 (finding unjust enrichment claim

---

[9] It is immaterial whether Plaintiffs have a viable claim for violation of the Wiretap Act or breach of implied contract; unjust enrichment "cannot remedy the defects" in a duplicative claim. *Coresello*, 967 N.E.2d at 1185; *Greene v. Clean Rite Ctrs., LLC*, 714 F. Supp. 3d 134, 151 (E.D.N.Y. 2024) ("[T]he fact that Plaintiff's [other] claim is insufficiently pled does not mean that her unjust enrichment claim based on the same allegations survives." (citation omitted)).

duplicative where it was "premised on the same alleged wrongdoing [as another claim], namely [the defendant's] unauthorized disclosure of Plaintiffs' sensitive personal information to third-party trackers").

Plaintiffs also fail to plead the essential elements of an unjust enrichment claim, including (1) that Defendants were enriched, (2) at Plaintiffs' expense, and (3) that it is against equity for Defendants to keep that supposed benefit. *Afriyie*, 775 F. Supp. 3d at 812. The allegations in the SAC do not show that Defendants were enriched at all. Plaintiffs only allege the estimated value of internet users' online data generally, SAC ¶¶ 82–86; they make no allegations about the value of ***their*** specific browsing data on the Website, or how that data supposedly enriched Defendants. *See B.K. v. Eisenhower Med. Ctr.*, 721 F. Supp. 3d 1056, 1070 (C.D. Cal. 2024) ("While Plaintiffs allege that 'a complete health care record sells for $250 on average,' the Complaint does not include facts specific to unjust enrichment of Defendant resulting from Plaintiffs' information."), *on reconsideration in part*, 2024 WL 2037404 (C.D. Cal. Apr. 11, 2024); *see also Dunahoo v. Hewlett-Packard Co.*, 2012 WL 178332, at *4 (S.D.N.Y. Jan. 20, 2012) (finding insufficient allegations showing that defendant benefitted from allegedly tortious conduct).

Likewise, the SAC is devoid of allegations demonstrating that any supposed enrichment was at Plaintiffs' expense. Plaintiffs never allege that their ability to monetize or otherwise use or benefit from data associated with activity on the Website was diminished by Defendants' alleged actions. That is fatal to their claim. *E.g.*, *Mount*, 2016 WL 5080131, at *6, *13 (dismissing unjust enrichment claim because "while plaintiffs reference programs compensating individuals in exchange for monitoring their web browsing, they do not allege that they are unable to participate in or would receive less compensation from such programs as a result of [defendant's] conduct").

Finally, Plaintiffs have not shown that it would be unjust for Defendants to retain any alleged benefits. Utilizing website activity data in connection with marketing and advertising is commonplace. As one court put it, "[t]hese days, it is widely understood that when browsing websites, your behavior may be tracked, studied, shared, and monetized." *Santoro v. Tower Health*, 2024 WL 1773371, at *1 (E.D. Pa. Apr. 24, 2024). For this reason, courts dismiss unjust enrichment claims predicated on the use of online activity data because "it simply is not reasonable for a consumer . . . to use the internet without charge and expect compensation because a provider of online services has monetized that usage." *In re Nickelodeon Consumer Priv. Litig.*, 2014 WL 3012873, at *19 (D.N.J. July 2, 2014). That is particularly true when Plaintiffs obtained the information they sought from the Website, SAC ¶¶ 91–92, and that activity was subject to the Privacy Policy, which disclosed use of the Website Technologies. Ahuja Decl. Ex. 1, at 2 (informing Website visitors about the use of Technology Vendors and stating that "[b]y using the Online Services, you consent to our collection, use, disclosure, and storage of information as described in this Privacy Policy"). Such disclosure negates an unjust enrichment claim. *See Cooper v. Slice Techs., Inc.*, 2018 WL 2727888, at *4–5 (S.D.N.Y. June 6, 2018) (dismissing unjust enrichment claim where visitor was informed of website conduct at issue); *Hammerling v. Google, LLC*, 2024 WL 937247, at *3 n.3 (9th Cir. Mar. 5, 2024) (holding that an unjust enrichment claim cannot survive when the defendants have not committed a "predicate actionable wrong") (citation omitted).

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Court grant their motion and Plaintiffs' claims with prejudice.

Respectfully submitted,

*/s/ Jasmeet K. Ahuja*

Jasmeet K. Ahuja (Bar No. 5294327)
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
jasmeet.ahuja@hoganlovells.com

Adam A. Cooke (*pro hac vice* forthcoming)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5479
Facsimile: (202) 637-5910
adam.a.cooke@hoganlovells.com

*Counsel for Crystal Run Healthcare Physicians, LLP and Crystal Run Ambulatory Surgery Center of Middletown, LLC*

**CERTIFICATE OF WORD COUNT**

Pursuant to Local Rule 7.1(c), I certify that the accompanying brief contains 8,719 words, excluding the parts of the document exempted by Local Rule 7.1(c). This certificate was prepared in reliance on the word-count function of the word processing system (Microsoft Word) used to prepare the document.

*/s/ Jasmeet K. Ahuja*
Jasmeet K. Ahuja