**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NADIA LOESEL and JENNIFER TURIANO, individually and on behalf of all others similarly situated,<br>*Plaintiffs,*<br>v.<br>CRYSTAL RUN HEALTHCARE PHYSICIANS, LLP, and CRYSTAL RUN AMBULATORY SURGERY CENTER OF MIDDLETOWN, LLC,<br>*Defendants*. | Case No.: 7:26-cv-00655-JGLC<br><br>***Document Filed Electronically*** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

**JAVERBAUM WURGAFT HICKS KAHN WIKSTROM & SININS, P.C.**
103 Eisenhower Parkway, Suite 401
Roseland, New Jersey 07068
Phone: (973) 403-9000
Fax: (973) 403-9021
Attorney: Scott E. Reiser, Esq.
Bar No.: 023012007
Email: sreiser@lawjw.com

**TRAMMELL PC**
3262 Westheimer Road, Suite 423
Houston, Texas 77098
Tel: (800) 405-1740
Fax: (800) 532-0992
Attorney: Fletcher V. Trammell
*Pro Hac Vice*
Email: fletch@trammellpc.com

*Counsel for Plaintiffs*

FLETCHER V. TRAMMEL
SCOTT E. REISER
Of Counsel and On the Brief

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ..... 1
ARGUMENT ..... 2
I. THE WIRETAP ACT PERMITS CIVIL LIABILITY FOR PROCUREMENT OF INTERCEPTIONS. ..... 2
A. Courts Have Recognized That ECPA Civil Liability Encompasses Procurement. ..... 2
B. The Statutory Text Confirms This Reading. ..... 4
C. Defendants Conflate Procurement With Secondary Liability. ..... 7
II. THE CRIME-TORT EXCEPTION TO ONE-PARTY CONSENT APPLIES. ..... 7
E. Defendants Impose An Improperly Heightened Intent Standard. ..... 12
F. Disclosure To Third Parties Is A Separate And Independent Act From Interception. ..... 16
III. PLAINTIFFS ADEQUATELY ALLEGE THE INTERCEPTION OF "CONTENTS". ..... 17
A. Search Queries And Healthcare-Seeking Communications Are "Contents." ..... 17
B. The Named Plaintiffs' Allegations Are Specific, Not Hypothetical. ..... 18
IV. THE PRIVACY POLICY DOES NOT DEFEAT PLAINTIFFS' ECPA CLAIM. ..... 18
A. Even On Defendants' Own Description, No Affirmative Consent Was Obtained. ..... 20
V. THE RULE OF LENITY DOES NOT APPLY ..... 21
VI. PLAINTIFFS STATE A CLAIM FOR BREACH OF IMPLIED CONTRACT. ..... 22
A. The Healthcare Context Establishes Mutual Assent to Confidentiality ..... 22
B. The Privacy Policy Does Not Negate The Implied Duty Of Confidentiality. ..... 23
C. Plaintiffs Adequately Allege Damages. ..... 24
VII. PLAINTIFFS STATE A CLAIM FOR UNJUST ENRICHMENT. ..... 25
A. The Unjust Enrichment Claim Is Not Duplicative Because The Existence Of An Implied Contract Is Disputed. ..... 25
B. Plaintiffs Adequately Plead The Elements Of Unjust Enrichment. ..... 27
CONCLUSION ..... 28

## TABLE OF CITATIONS

**PAGE**

**Cases**

*Am. Hosp. Ass'n v. Becerra*, 738 F. Supp. 3d 780 (N.D. Tex. 2024), ............................ 8, 9, 10, 11

*Boseovski v. McCloud Healthcare Clinic, Inc.*, 2020 WL 68578, at *6 (E.D. Cal. Jan. 7, 2020) ............................................................................................................ 3

*Campbell v. Facebook, Inc.*, 951 F.3d 1106 (9th Cir. 2020) ........................................................ 3

*Caro v. Weintraub*, 618 F.3d 94 (2d Cir. 2010)......................................................... 8, 13, 16, 17

*Castillo v. Costco Wholesale Corp.*, 2024 WL 4785136, at *6 (W.D. Wash. Nov. 14, 2024) ............................................................................................................ 13

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)............................................................................................................ 6

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) .................................................. 19

*CITGO Petro. Corp. v. Ascot Underwriting Ltd.*, 158 F.4th 368 (2d Cir. 2025)......................... 20

*Cooper v. Mount Sinai Health Sys., Inc.*, 742 F. Supp. 3d 369 (S.D.N.Y. 2024)............ 11, 17, 26

*Coresello v. Verizon New York, Inc.*, 967 N.E.2d 1177 (N.Y. 2012) ......................................... 26

*Cvent, Inc. v. Eventbrite, Inc.,* 739 F. Supp. 2d 927 (E.D. Va. 2010) ......................................... 21

*Dawson v. Univ. of Phoenix, Inc.*, 2026 WL 92248, at *13–14 (N.D. Ill. Jan. 13, 2026) .......... 3, 6

*Doe v. Bayhealth Med. Ctr., Inc.*, 2025 WL 1011508, at *6 (Del. Super. Apr. 2, 2025) ....... 11, 12

*Doe v. Roe*, 93 Misc. 2d 201 (N.Y. Sup. Ct. 1977) ........................................................ 23, 24, 25

*Gay v. Garnet Health*, 2024 WL 4203263, at *3–4 (S.D.N.Y. Sept. 16, 2024) .......................... 11

*Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (N.Y. 2012).......................................... 26

*Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150 (2d Cir. 2006) ...................... 20

*Hall v. EarthLink Network, Inc.*, 396 F.3d 500 (2d Cir. 2005)...................................................... 3

*Hartley v. Univ. of Chicago Med. Ctr.*, 2025 WL 2802317, at *4 (N.D. Ill. Oct. 1, 2025) ............................................................................................................ 11

*In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051 (N.D. Cal. 2015) ........................................................ 7

*In re Google, Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 1255 (3d Cir. 2015) ........................................................ 3

*In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778 (N.D. Cal. 2022) ............................ 9, 18

*In re Pharmatrak, Inc.*, 329 F.3d 9, 18 (1st Cir. 2003) ........................................................ 3

*J.C. v. Catholic Health Sys., Inc.*, 2024 WL 5136236, at *14 (W.D.N.Y. Aug. 29, 2024) .......... 10

*Jarrell v. Adena Health Sys.,* 2025 WL 81305, at *3 (S.D. Ohio Jan. 13, 2025) ......................... 16

*JPMorgan Chase Bank, N.A. v. Maurer*, 2015 WL 539494, at *6 (S.D.N.Y. Feb. 10, 2015) ........................................................ 28

*Kane v. Univ. of Rochester*, 2024 WL 1178340, at *6–8 (W.D.N.Y. Mar. 19, 2024).................. 11

*Kirch v. Embarq Mgmt. Co.*, 702 F.3d 1245 (10th Cir. 2012)........................................................ 6

*Kurowski v. Rush Sys. for Health*, 2024 WL 3455020, at *5 (N.D. Ill. July 18, 2024).......... 12, 14

*Leibowitz v. Cornell Univ.*, 584 F.3d 487 (2d Cir. 2009) ........................................................ 22

*Lonegan v. Hasty*, 436 F. Supp. 2d 419 (E.D.N.Y. 2006) ........................................................ 3, 6

*Lugo v. Inova Health Care Servs.*, 2025 WL 905191, at *6–8 (E.D. Va. Mar. 25, 2025) ........... 11

*Mekhail v. N. Mem'l Health Care*, 2024 WL 1332260, at *5 n.4 (D. Minn. Mar. 28, 2024) ........................................................ 13

*Muscarello v. United States*, 524 U.S. 125 (1998) ........................................................ 21

*Nienaber v. Overlake Hosp. Med. Ctr.*, 2025 WL 692097, at *5–6 (W.D. Wash. Mar. 4, 2025) ........................................................ 11

*Pattison v. Teladoc Health, Inc.*, 2025 WL 1756364, at *3 (S.D.N.Y. June 25, 2025)................ 11

*Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 168–69 (5th Cir. 2000) .............................................. 5, 6

*Perry v. Rockmore*, 238 A.D.3d 67 (N.Y. App. Div. 3d Dep't 2025) .......................................... 23

*Q.J. v. PowerSchool Holdings, LLC*, 2025 WL 2410472, at *6 (N.D. Ill. Aug. 20, 2025) (same)........................................................ 3, 6

*R.S. v. Prime Healthcare Servs., Inc.*, 2025 WL 103488, at *4–5 (C.D. Cal. Jan. 13, 2025) ........................................................ 11, 13, 16

*Reno v. Koray*, 515 U.S. 50 (1995) ..... 22

*Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp .3d 1075, 1090 (N.D. Cal. 2025) ..... 13

*Schnabel v. Trilegiant Corp.*, 697 F.3d 110n.18 (2d Cir. 2012) ..... 20

*Smart v. Main Line Health*, 2026 WL 1008171, at *3 (E.D. Pa. Apr. 14, 2026) ..... 11

*Stein v. Edward-Elmhurst Health*, 2025 WL 580556, at *5–6 (N.D. Ill. Feb. 21, 2025) ..... 11

*Valentine v. WideOpen W. Fin., LLC*, 288 F.R.D. 407 n.3 (N.D. Ill. 2012) ..... 3

*W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *7 (M.D. Fla. Mar. 6, 2025) ..... 11

*Wells Fargo Bank, N.A. v. U.S. Life Ins. Co. of N.Y*, 2026 WL 1492916, at *16 (S.D.N.Y. May 28, 2026) ..... 20

**Statutes**

18 U.S.C. § 2510(8) ..... 18

18 U.S.C. § 2511 *et seq.* ..... 1

18 U.S.C. § 2511(1)(a) ..... 4

18 U.S.C. § 2511(2)(d) ..... 8

18 U.S.C. § 2520 ..... 3

18 U.S.C. § 2520(a) ..... 4, 5

42 U.S.C. § 1320d-6 ..... 14

42 U.S.C. § 1320d-6(b)(3) ..... 14

*In re DoubleClick, Inc. Priv. Litig.,* 154 F. Supp. 2d 497 (S.D.N.Y. 2001) ..... 15

**Other Authorities**

78 Fed. Reg. 5566, 5598 (Jan. 25, 2013) ..... 10

Black's Law Dictionary ..... 7

Black's Law Dictionary (12th ed.) ..... 4

Electronic Communications Privacy Act of 1986 ..... 1

**Rules**

45 C.F.R. § 164.514(b)(2)(i) ........ 9

Fed. R. Evid. 201(b)(2) ........ 19

Federal Rule of Civil Procedure 8(d)(2) ........ 27

Federal Rule of Evidence 201(b) ........ 19

Rule 12(d) ........ 20

## INTRODUCTION

Defendants, collectively referred to as "Crystal Run," embedded invisible tracking code on their website that intercepts patients' health communications in real time and transmits them to Google and The Trade Desk for advertising purposes. For example, when a patient types "ovarian cancer" into the website's search bar, clicks on a psychiatrist's profile, or requests a new patient appointment, that activity is silently captured, tagged with persistent identifiers, and delivered to commercial advertising ecosystems. Defendants ask this Court to hold that a healthcare provider may do all of this and face no liability under federal or state law. That position is wrong as a matter of statutory text, precedent, and common sense.

With respect to the claim under the federal Wiretap Act, 18 U.S.C. § 2511 *et seq.* (as amended by the Electronic Communications Privacy Act of 1986, and referred to as the "Wiretap Act" or "ECPA"), Defendants' motion rests on three principal contentions: (1) the Wiretap Act does not permit civil liability for "aiding and abetting" or procurement of interceptions; (2) the crime-tort exception to one-party consent does not apply; and (3) the data intercepted does not constitute "contents" within the meaning of the statute. Each argument fails.

On procurement, multiple appellate courts have described the civil cause of action under the Wiretap Act as encompassing procurement, and the statutory text confirms that reading. On the crime-tort exception, Defendants selectively cite from one side of a genuine and well-recognized split in authority, while ignoring the growing body of case law—including decisions from this very District—holding that a healthcare provider's knowing disclosure of individually identifiable health information to advertising companies in violation of HIPAA satisfies the exception. On "contents," Defendants characterize physician searches, medical condition queries, and appointment requests as mere "record information," ignoring that these communications

convey the very substance of a patient's healthcare-seeking activity.

Defendants also ask this Court to judicially notice a privacy policy not referenced in the Second Amended Complaint, never shown to have been seen or assented to by Plaintiffs, and disclosed only through a passive hyperlink at the bottom of each webpage with no mechanism for obtaining affirmative consent.

Defendants' attacks on Plaintiffs' common law claims are equally unavailing. Their challenge to the breach of implied contract claim ignores that the healthcare relationship itself gives rise to an implied duty of confidentiality, and their challenge to the unjust enrichment claim rests on the internally contradictory position that no implied contract exists yet the unjust enrichment claim is duplicative of the implied contract. The Court should deny the motion in its entirety.

## ARGUMENT

### I. THE WIRETAP ACT PERMITS CIVIL LIABILITY FOR PROCUREMENT OF INTERCEPTIONS.

Defendants argue that § 2520 does not permit civil claims based on the "procurement" of interceptions, and that civil liability is limited to persons who directly intercept, disclose, or use communications. MTD at 7. This argument is at odds with the statutory text and with how appellate courts, including the Second Circuit, have described the civil cause of action under the Wiretap Act.

#### A. Courts Have Recognized That Ecpa Civil Liability Encompasses Procurement.

Multiple federal appellate courts, when articulating the scope of the civil cause of action under the Wiretap Act, have included procurement among the actionable forms of conduct. The

Ninth Circuit has stated that the "ECPA includes a private right of action, 18 U.S.C. § 2520, against anyone who 'intentionally intercepts, endeavors to intercept, or *procures any other person to intercept* or endeavor to intercept, any wire, oral, or electronic communication.'" *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1117 (9th Cir. 2020) (emphasis added). The First Circuit has similarly held that a plaintiff states a civil claim by showing that the defendant "(1) intentionally (2) intercepted, endeavored to intercept or *procured another person to intercept* or endeavor to intercept (3) the contents of (4) an electronic communication (5) using a device." *In re Pharmatrak, Inc.*, 329 F.3d 9, 18 (1st Cir. 2003) (emphasis added). The Third Circuit has adopted the same formulation. *In re Google, Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 135 (3d Cir. 2015). And the Second Circuit, when analyzing a civil ECPA claim, quoted § 2511(1)(a) in full, including its procurement provision, and proceeded to analyze the claim under that framework without questioning whether procurement was civilly actionable. *Hall v. EarthLink Network, Inc.*, 396 F.3d 500, 503 (2d Cir. 2005).

District courts that have directly addressed the question have reached the same conclusion. *See Dawson v. Univ. of Phoenix, Inc.*, 2026 WL 92248, at *13–14 (N.D. Ill. Jan. 13, 2026) (reviewing the competing lines of federal court authority and concluding that "[b]oth the persons directly intercepting the communications and the persons who procured interception have violated the ECPA"); *Lonegan v. Hasty*, 436 F. Supp. 2d 419, 428 (E.D.N.Y. 2006) (same); *Valentine v. WideOpen W. Fin., LLC*, 288 F.R.D. 407, 412 n.3 (N.D. Ill. 2012) (same); *Boseovski v. McCloud Healthcare Clinic, Inc.*, 2020 WL 68578, at *6 (E.D. Cal. Jan. 7, 2020) (same); *Q.J. v. PowerSchool Holdings, LLC*, 2025 WL 2410472, at *6 (N.D. Ill. Aug. 20, 2025) (same).

**B. The Statutory Text Confirms This Reading.**

The statutory structure reinforces what federal courts have held. Section 2511(1)(a) establishes three parallel criminal prohibitions: it is a violation for any person who (1) "intentionally intercepts," (2) "endeavors to intercept," or (3) "procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). Procurement is a freestanding violation, listed in parallel with interception itself.

Section 2520(a) then provides that any person whose communications are "intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity … *which engaged in that violation*." 18 U.S.C. § 2520(a) (emphasis added). Defendants read the phrase "intercepted, disclosed, or intentionally used" as limiting civil liability to those three acts alone, excluding procurement. MTD at 7. But that language describes the *type of harm* that gives rise to a cause of action—i.e., that the plaintiff must show that a communication was intercepted, disclosed, or used—and not the *category of defendant* who may be sued. The category of defendant is defined by the clause that follows: "the person or entity … which engaged in that violation." Because procurement is a violation of § 2511(1)(a), a person who procures an interception has "engaged in that violation" and is subject to civil suit. Moreover, Congress did not limit civil liability to the person who "committed" or "carried out" the violation. Rather, it chose the broader phrase "engaged in that violation," which naturally encompasses the party that arranged for the violation to occur. *See* Black's Law Dictionary (12th ed.) (defining "engage" as "*[t]o employ or involve oneself; to take part in*; to embark on" (emphasis added)).

Defendants may point to the 1986 amendment as evidence that Congress intended to eliminate civil procurement liability. Before the ECPA, § 2520(a) expressly provided a cause of action against any person who "intercepts, discloses, or uses, or procures any other person to

intercept, disclose, or use such communications." The 1986 amendment replaced that language with the current catch-all permitting recovery from "the person or entity … which engaged in that violation." The Fifth Circuit in *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 168–69 (5th Cir. 2000), inferred from this deletion that Congress intended to remove civil procurement liability, applying the presumption that a significant change in statutory language entails a change in meaning.

That inference is unpersuasive for several reasons. First, the 1986 amendment did not simply delete the procurement reference; it replaced the entire enumeration of liable parties with a broader formulation. The prior version listed specific categories of violators. The amended version substituted a catch-all covering any person who "engaged in that violation." 18 U.S.C. § 2520(a). Reading the shift from an enumeration to a catch-all as *narrowing* the provision's reach inverts the more natural inference: that Congress simplified the language while preserving its scope. The *Peavy* court's error lies in reading the phrase "intercepted, disclosed, or intentionally used" as defining the category of defendant who may be sued. But as discussed above, that language describes the statutory precondition for bringing suit: the plaintiff must show that a communication was intercepted, disclosed, or used in violation of the Act. The category of defendant is defined by the separate clause that follows: "the person or entity … which engaged in that violation." *Peavy* collapses these two distinct inquiries into one, reading a standing requirement as a liability limitation.

Second, Congress left procurement as a violation in the unamended § 2511(1)(a). If Congress intended to remove civil liability for procurement, the result would be a statutory prohibition with no corresponding civil remedy, an unlikely outcome given that every other violation of § 2511(1)(a) is civilly actionable under § 2520(a).

Third, the courts that have followed *Peavy* have tended to conflate procurement with

aiding-and-abetting liability. The Tenth Circuit in *Kirch v. Embarq Mgmt. Co.*, 702 F.3d 1245, 1246–47 (10th Cir. 2012), framed its analysis entirely around aiding and abetting, relying on *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), which held that there is no general presumption of civil aiding-and-abetting liability. But procurement under § 2511(1)(a) is not a theory of derivative secondary liability; it is an independent statutory prohibition.

Fourth, and consistent with the above points, several district courts (including at least one in the Second Circuit) have considered and expressly declined to follow *Peavy*'s reasoning. *See,* for example; *Lonegan*, 436 F. Supp. 2d at 428; *Dawson*, 2026 WL 92248, at *13–14; *Q.J. v. PowerSchool*, 2025 WL 2410472, at *6.

More generally, if procurement were only criminally punishable but not civilly actionable, an entity could immunize itself from civil liability simply by outsourcing the mechanics of interception to a willing third party. A corporation could hire a firm to wiretap a competitor's electronic communications and steal trade secrets, and the victim would have no civil remedy under ECPA against the corporation that arranged the entire scheme, so long as the corporation did not personally operate the surveillance equipment. The consequences of that reading are particularly stark in cases like this one, where the third-party technology vendors would, at least according to Defendants (*see* MTD at 8), themselves be shielded by the one-party consent defense as participants in the communications. If the procurer also cannot be sued, *neither* party faces civil liability. Moreover, the procurer is typically the party that decides whether the interception occurs, that benefits from the intercepted data, and that has a preexisting relationship with the victim. Limiting civil liability to the entity that performs the technical act of interception, while immunizing the entity that arranged it, would remove the civil incentive from the party best

positioned to prevent the harm.

### C. Defendants Conflate Procurement With Secondary Liability.

Several of the cases Defendants cite address a different question: whether a party who merely *facilitated* or *contributed to* another's interception can be held vicariously liable under a theory of aiding and abetting or contributory liability. *See*, for example, *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1089-90 (N.D. Cal. 2015). The proposition that the Wiretap Act does not create vicarious or contributory liability for parties who had no role in arranging an interception may be unremarkable. But it does not answer the question whether someone who *affirmatively procures* another to intercept communications is liable for its own primary violation of the statute. Procurement under § 2511(1)(a) is not a derivative or secondary theory; it is an independent statutory prohibition.

Crystal Run did not merely contribute to an interception by a rogue third party. It made the deliberate decision to embed Google's DoubleClick and The Trade Desk's tracking code on its website. SAC ¶¶ 25, 41, 57, 73. It controlled which pages contained the code, chose not to exclude sensitive healthcare pages, and maintained the arrangement on an ongoing basis. SAC ¶ 74. By embedding that code, Crystal Run caused and arranged for Google and The Trade Desk to intercept visitors' communications; without Crystal Run's affirmative decision to insert the code, they would have had no access to those communications whatsoever. SAC ¶ 73. That is procurement within the ordinary meaning of the term, not secondary liability. *See* Black's Law Dictionary (defining "procure" as "to achieve *or bring about (a result)*" (emphasis added)).

## II. THE CRIME-TORT EXCEPTION TO ONE-PARTY CONSENT APPLIES.

Defendants argue that even if they were parties to the communications at issue, the one-

party consent limitation bars Plaintiffs' claim. MTD at 8. But § 2511(2)(d) provides that one-party consent does not shield an interception made "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). The exception serves to ensure that the one-party consent defense cannot be weaponized to shield conduct that undermines the very trust relationships the law is designed to protect. *See Caro v. Weintraub*, 618 F.3d 94, 99 (2d Cir. 2010) (discussing legislative history showing that the exception was enacted to prevent use of the consent defense for "insidious purposes" such as the commission of a "criminal or tortious act"). Plaintiffs have adequately alleged that Crystal Run's interception was for the purpose of committing acts that are both criminal under HIPAA and tortious under state law.

**A. Crystal Run Violated HIPAA, and Defendants' Reliance on Becerra Is Misplaced.**

Defendants lean heavily on *Am. Hosp. Ass'n v. Becerra*, 738 F. Supp. 3d 780 (N.D. Tex. 2024), which vacated parts of an HHS Office for Civil Rights guidance bulletin that had treated the combination of an IP address and a URL visited on a healthcare website as individually identifiable health information. MTD at 9. But Plaintiffs do not rely on those parts of the guidance bulletin to invoke the crime-tort exception. Plaintiffs rely on the statutory definition of IIHI, HIPAA's de-identification safe harbor, and the specific data elements alleged in the SAC, which go well beyond what was at issue in *Becerra.*

*First, Becerra did not address the information at issue here.* The court in *Becerra* expressly limited its reasoning to what it termed the "proscribed combination" of an IP address plus a URL visited on a healthcare website. 738 F. Supp. 3d at 789, 807 n.3. It did not address the situation presented here, where a URL conveying substantive, sensitive health information is combined with

cookie-based persistent identifiers that track users across the internet. SAC ¶¶ 28, 43. In the case of DoubleClick's DSID cookie, this does not merely identify a device; it identifies a specific person who is logged into Google services, enabling Google to associate the user's healthcare browsing activity with their known identity. *See id.* ¶¶ 28, 43, 62-70. Moreover, the SAC alleges the URL and cookie identifiers are further combined with IP addresses, which allow Google and the Trade Desk to build detailed profiles of individual users' daily routines and behaviors, distinguishing specific individuals even among users who share the same household or workplace network. *Id.* ¶¶ 33, 37, 47, 48. All this goes well beyond *Becerra*'s "proscribed combination" and falls squarely within the core of HIPAA protection.

*Second, HIPAA's own de-identification safe harbor expressly lists the identifiers at issue here.* Under 45 C.F.R. § 164.514(b)(2)(i), covered entities must strip 18 categories of identifiers before sharing any health information with a third party. Those identifiers include "Internet Protocol (IP) address numbers," "Device identifiers," "Web Universal Resource Locators (URLs)," and "[a]ny other unique identifying number, characteristic, or code." *Id.* Crystal Run transmitted all of these categories of data to Google and The Trade Desk without stripping any of them. *See* SAC ¶¶ 28, 30, 33, 62-70. The fact that HIPAA's own regulatory framework treats these data elements as identifiers that must be removed before disclosure directly undermines Defendants' argument that such data cannot "identify" an individual for IIHI purposes.

*Third, patient status is itself protected health information.* Courts have held that the mere fact of being a patient of a particular healthcare provider constitutes PHI. *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 792 (N.D. Cal. 2022) (holding that "Patient Status Is Protected Health Information" and that "the act of clicking the "Log in" button, when coupled with the MedStar Health patient portal URL and the other information transmitted by the Pixel,

sufficiently identifies the website user as a patient”). Here, when a user clicks “Pay Bill” or “Request New Patient Appointment” on Crystal Run’s website, and that action is transmitted to Google along with persistent identifiers, it similarly reveals patient status regardless of whether any specific diagnosis or test result is disclosed.

*Fourth, HHS’s own rulemaking confirms Plaintiffs’ position.* In the 2013 HIPAA Omnibus Rule, HHS clarified that “if the information is tied to a covered entity, then it is protected health information by definition since it is indicative that the individual received health care services or benefits from the covered entity.” 78 Fed. Reg. 5566, 5598 (Jan. 25, 2013). Here, the very URLs being transmitted inherently tie the browsing data to a covered entity and, frequently, to a specific health condition or service. *See* SAC ¶¶ 69-70.

*Fifth, the “relates to” prong of 42 U.S.C. § 1320d(6) is satisfied at the pleading stage.* Defendants contend that browsing activity on public pages does not necessarily “relate to” a visitor’s health because the visitor could be a researcher, an employee, or a casual browser. MTD at 10. But on a motion to dismiss, the Court must draw all reasonable inferences in Plaintiffs’ favor. Plaintiffs specifically allege that they visited the website to find doctors, request appointments, and search for medical specialties. *Id.* ¶¶ 91–92. The question of why any particular visitor accessed a healthcare page is an inherently factual inquiry that is inappropriate for resolution at the 12(b)(6) stage.

*Sixth, Courts have expressly declined to follow Becerra’s administrative law holding in the private civil context.* This includes decisions in cases involving allegations that, like those here, go beyond the standalone IP address and URL combination that *Becerra* considered. In *J.C. v. Catholic Health Sys., Inc.*, a court in this Circuit expressly rejected *Becerra*’s analysis, observing that it improperly “places the burden to protect this information squarely on individuals, when the

health care provider, which owns the website and controls what information is collected and then re-transmitted to third parties, is in the best position to control the information it receives." 2024 WL 5136236, at *14 (W.D.N.Y. Aug. 29, 2024), report and recommendation adopted, 2025 WL 351043 (W.D.N.Y. Jan. 31, 2025). *See also Hartley v. Univ. of Chicago Med. Ctr.*, 2025 WL 2802317, at *4 (N.D. Ill. Oct. 1, 2025) (*Becerra* addressed "generally applicable HHS guidance about public websites, not specific allegations about specific individuals' use of specific websites," and its holding "does not also mean that information from public websites can *never* amount to [individually identifiable health information]"); *Smart v. Main Line Health*, 2026 WL 1008171, at *3 (E.D. Pa. Apr. 14, 2026) (distinguishing *Becerra* where tracking code on public-facing login page plausibly revealed patient status); *Nienaber v. Overlake Hosp. Med. Ctr.*, 2025 WL 692097, at *5–6 (W.D. Wash. Mar. 4, 2025) (distinguishing *Becerra* where disclosed information included patient status and persistent identifier); *Doe v. Bayhealth Med. Ctr., Inc.*, 2025 WL 1011508, at *6 (Del. Super. Apr. 2, 2025) amended by 2025 WL 1010403 (Del. Super. Apr. 4, 2025) (same).

More generally, numerous courts have sustained ECPA claims on facts comparable to those alleged here. *See Cooper v. Mount Sinai Health Sys., Inc.*, 742 F. Supp. 3d 369, 382–83 (S.D.N.Y. 2024); *Gay v. Garnet Health*, 2024 WL 4203263, at *3–4 (S.D.N.Y. Sept. 16, 2024); *Pattison v. Teladoc Health, Inc.*, 2025 WL 1756364, at *3 (S.D.N.Y. June 25, 2025); *Kane v. Univ. of Rochester*, 2024 WL 1178340, at *6–8 (W.D.N.Y. Mar. 19, 2024); *R.S. v. Prime Healthcare Servs., Inc.*, 2025 WL 103488, at *4–5 (C.D. Cal. Jan. 13, 2025); *Stein v. Edward-Elmhurst Health*, 2025 WL 580556, at *5–6 (N.D. Ill. Feb. 21, 2025); *W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *7 (M.D. Fla. Mar. 6, 2025); *Lugo v. Inova Health Care Servs.*, 2025 WL 905191, at *6–8 (E.D. Va. Mar. 25, 2025); *Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814 (E.D. Cal. 2025). Defendants cherry-pick from one side of a genuine and widely recognized split in authority,

while decisions from this very District support Plaintiffs.

Defendants otherwise seek to minimize these allegations by emphasizing that the tracking technologies at issue are "ubiquitous" and "commonplace," alleging (without request for judicial notice) that even this Court's website uses Google Analytics. MTD at 1. But the fact that a practice is widespread does not make it lawful. And the comparison elides a critical distinction: a person visiting a federal court's website is in a fundamentally different position from a person searching for a psychiatrist or researching a cancer diagnosis on their healthcare provider's website. The ubiquity of tracking on non-healthcare websites says nothing about whether the same tools violate the law when a HIPAA-covered entity deploys them on pages where patients disclose sensitive health information and from which a user's status as a patient can be ascertained.

**B. Defendants Impose An Improperly Heightened Intent Standard.**

Defendants contend that the crime-tort exception requires Plaintiffs to demonstrate that Crystal Run's "primary motivation" or "a determinative factor" in implementing the trackers was to violate HIPAA, and that Crystal Run's actual commercial purpose of advertising and analytics negates any criminal or tortious purpose. MTD at 13. They contend that because Crystal Run implemented the trackers for advertising and analytics purposes, its purpose was not criminal or tortious. *Id.* at 14–15. This argument fails on two independent grounds.

*First, the existence of a commercial motive does not establish the absence of criminal or tortious purpose; the two are not mutually exclusive.* As the Northern District of Illinois observed on reconsideration in *Kurowski v. Rush Sys. for Health*, "[m]any crimes and torts are motivated by a desire to make money, and it 'defies common sense that a clearly harmful act could escape liability as long as it was done for profit.'" 2024 WL 3455020, at *5 (N.D. Ill. July 18, 2024)

(quoting *Mekhail v. N. Mem'l Health Care*, 2024 WL 1332260, at *5 n.4 (D. Minn. Mar. 28, 2024)); *see also Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp .3d 1075, 1090 (N.D. Cal. 2025) ("committing a tort and seeking a profit are not mutually exclusive (if anything, the latter is often the reason for the former)"); *Castillo v. Costco Wholesale Corp.*, 2024 WL 4785136, at *6 (W.D. Wash. Nov. 14, 2024) (declining to adopt "bright-line rule insulating financial motives from the crime-tort exception").

The consequences of Defendants' proposed rule extend well beyond the healthcare website context. If a commercial motive negates the crime-tort exception, the exception collapses in multiple scenarios in which the Wiretap Act might be invoked: consider a private investigator hired to wiretap a competitor's calls and steal trade secrets acts for commercial purposes, or a tabloid that intercepts a celebrity's phone calls to publish the recordings acts for commercial purposes. Even blackmail—the Second Circuit's own paradigmatic example of conduct the exception was designed to reach—is frequently commercially motivated: the blackmailer intercepts a private communication for the purpose of extracting money. *See Caro v. Weintraub*, 618 F.3d at 99; *see also R.S. v. Prime Healthcare Servs.,* 2025 WL 103488, at *7 ("[u]nder [Defendant's] reading, the ECPA would not prohibit a person from intercepting a communication with the intent to use that communication to blackmail so long as the ultimate reason for the blackmail was to make money"). Under Defendants' framework, each of these actors could invoke the one-party consent defense to escape liability by pointing to their predominant underlying financial motive. The result is that the crime-tort exception would apply only to interceptions motivated by pure personal malice with no financial component, a narrow category that bears no resemblance to the exception Congress actually wrote.

HIPAA itself also addresses this issue. The predicate crime alleged here is a HIPAA

violation under 42 U.S.C. § 1320d-6. Rather than treating commercial motivation as exculpatory, § 1320d-6(b)(3) imposes *enhanced* criminal penalties where protected health information is knowingly transferred "for commercial advantage." 42 U.S.C. § 1320d-6(b)(3). Plaintiffs' allegations that Defendants used the trackers for advertising and commercial purposes, (SAC ¶¶ 75–76) describes precisely the conduct HIPAA punishes most severely.

*Second, the statute does not require a heightened mens rea beyond "purpose."* The plain text of § 2511(2)(d) provides that the exception applies when the communication "is intercepted for the purpose of committing any criminal or tortious *act*." The word "act" is what must be criminal or tortious; the statute does not require that the defendant subjectively desired to break the law as such. The court in *Stein v. Edward-Elmhurst Health* explained this distinction with clarity:

> "A person can have a purpose of committing an act that is criminal or tortious, without having a criminal or tortious purpose. Imagine changing lanes on the highway without looking, and nailing the car in the other lane. The bad driver may have acted with the purpose of committing an act—changing lanes—that was tortious (because of the lack of ordinary care). But that's different than saying that the driver acted with a tortious purpose."

2025 WL 580556, at *6. The *Stein* court concluded that "[t]he 'act' must be criminal or tortious, but the 'purpose' does not need to be criminal or tortious." *Id.; see also Kurowski*, 2024 WL 3455020, at *4 (rejecting a "heightened willfulness" requirement and holding it sufficient that the defendant "actively chose to employ the tracking technology" knowing it would disclose patient data).

Defendants' reading would require plaintiffs to plead that the defendant not only intended the act but subjectively appreciated that the act was unlawful. The statute contains no such requirement. And the practical consequences of adopting one would be to turn ignorance of the law into a defense, rewarding the entities that pay the least attention to their legal obligations with

the strongest shields against liability. That perverse incentive is particularly stark in the HIPAA context, where Congress imposed extensive regulatory requirements reflecting the high sensitivity of patient medical data and the serious harms that can flow from its unauthorized disclosure.

Here, Crystal Run knowingly implemented the tracking code on its website through a deliberate process requiring its web administrators to copy the code and insert it into the Website's source code. SAC ¶¶ 3, 73. Once implemented, the code automatically transmits user data to Google and The Trade Desk. *Id.* ¶¶ 26, 42. Crystal Run chose which pages to deploy it on, chose not to exclude pages where patients search for doctors or research medical conditions, and maintained the arrangement on an ongoing basis. *Id.* ¶¶ 73–74. That sequence of deliberate choices constitutes a purpose to commit the act that is criminal under HIPAA: the disclosure of IIHI to unauthorized third parties.

Defendants rely heavily on *In re DoubleClick, Inc. Priv. Litig.,* 154 F. Supp. 2d 497 (S.D.N.Y. 2001), which adopted the "primary motivation" or "determinative factor" test Defendants advocate. *Id.* at 514–15. For the reasons discussed above, Plaintiffs submit that this heightened standard is fallacious and not supported by the statutory text. But even on its own terms, *DoubleClick* does not support dismissal. The court there recognized that "the mere existence of [a] lawful purpose alone does not sanitize a[n interception] that was also made for an illegitimate purpose." *Id.* at 515. Moreover, *DoubleClick* involved a general advertising technology company with no independent legal duties regarding the data it collected. Crystal Run, by contrast, is a HIPAA-covered entity with affirmative legal obligations not to disclose individually identifiable health information. Its deliberate choice to embed tracking code that automatically transmits patient data to advertising companies, despite those obligations, plausibly supports a finding of criminal or tortious purpose even under the *DoubleClick* standard.

**C. Disclosure To Third Parties Is A Separate And Independent Act From Interception.**

Defendants argue, citing *Caro v. Weintraub*, 618 F.3d 94 (2d Cir. 2010), that Plaintiffs' alleged HIPAA violation and invasion of privacy are not "separate and independent" from the interception itself because both arise from the same transmission of data. MTD at 16. This argument conflates temporal simultaneity with legal independence.

The interception is the acquisition of the communication. The HIPAA violation is the *disclosure* of individually identifiable health information to unauthorized third parties. These are analytically and legally distinct acts, even if they occur near-simultaneously. As the court in *Jarrell v. Adena Health Sys.,* explained, "an independent tort … arises not from the mere *interception* of Plaintiff's clicks and search terms, but from the *disclosure* of [that material] to third parties," "interception and disclosure are functionally distinct steps," and that "tortfeasors under the ECPA [should not] enjoy a bizarre defense to liability as a reward for their efficiency." 2025 WL 81305, at *3 (S.D. Ohio Jan. 13, 2025) (emphasis in original).

The court in *R.S. v. Prime Healthcare Servs.* also rejected the argument Defendants make here. The court held that disclosure in violation of HIPAA "constitutes a 'further impropriety' independent and separate from [defendant's] interception," even though it occurs near-instantaneously. 2025 WL 103488, at *6. As that court observed, Defendants' position improperly "conflates the crime-tort exception's 'separate and independent' component with its 'temporal' component." *Id.* "Whether the disclosure occurs simultaneously with or shortly after the interception, [Defendant's] purpose remained the same at the time of the interception: to disclose private information to third parties in violation of HIPAA." *Id.*

*Caro* is also distinguishable. In *Caro*, the alleged tort was invasion of privacy through the

recording itself, of a heated family conversation that was later submitted in probate proceedings. 618 F.3d at 96. The Second Circuit held that where the tort "occurs through the act of the interception" and "[n]othing more is required after the interception," the separate-and-independent requirement is not met. *Id.* at 101. Here, however, the interception does not complete the alleged wrong. The HIPAA violation requires *disclosure* of IIHI to an unauthorized third party, and there is also commercial exploitation that follows well beyond the moment of acquisition: the intercepted data is incorporated into Google's and The Trade Desk's advertising ecosystems, combined with data from their networks of partner websites, and used to build comprehensive user profiles for targeted advertising and real-time ad bidding. SAC ¶¶ 36–37, 46, 60. The "something more" after interception is the disclosure of IIHI to technology vendors who then process, store, and commercially exploit it. *See Cooper*, 742 F. Supp. 3d at 382–83 (distinguishing *Caro* on this basis in a pixel-tracking case).

## III. PLAINTIFFS ADEQUATELY ALLEGE THE INTERCEPTION OF "CONTENTS".

Defendants argue that URLs, IP addresses, and browsing activity constitute mere "record information" rather than "contents" within the meaning of the statute. MTD at 17. But the SAC alleges the interception of far more than routing or addressing data.

### A. Search Queries And Healthcare-Seeking Communications Are "Contents."

The Wiretap Act defines "contents" to "include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8). The SAC does not merely allege the transmission of URLs or IP addresses. It alleges the interception of free-text search queries for medical conditions such as "Ovarian Cancer," SAC ¶ 69; the names of physicians searched, SAC ¶ 62; medical specialties browsed, SAC ¶ 64; appointment requests submitted, SAC ¶ 68; and

callback requests made, SAC ¶ 67.

Even the URLs at issue here convey substantive meaning. A URL such as "crystalrunhealthcare.com/articles/how-to-check-for-ovarian-cancer" is not the equivalent of a blank envelope bearing only an address. It reveals the substance of the user's inquiry: that the user is seeking information about how to check for ovarian cancer. Context matters when distinguishing contents from record information, and URLs that embed search terms or reveal the nature of the content being accessed can constitute "contents." *See In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 798–99 (finding that similar data could constitute "contents" under the Wiretap Act).

### B. The Named Plaintiffs' Allegations Are Specific, Not Hypothetical.

Defendants attempt to characterize the SAC's allegations as pertaining to "hypothetical" website visitors. But the named Plaintiffs specifically allege that they used the "Find a Doctor" feature, searched for medical specialties, requested new patient appointments, requested callbacks, and used the website's search bar. SAC ¶¶ 91–92. The detailed examples in the SAC (*id.* ¶¶ 62–71) describe the types of data the trackers intercept when users engage in precisely these activities. Defendants' characterization of these allegations as "hypothetical" elevates form over substance and ignores the clear connection between the Plaintiffs' alleged activities and the interceptions described in the complaint.

## IV. THE PRIVACY POLICY DOES NOT DEFEAT PLAINTIFFS' ECPA CLAIM.

Defendants request that the Court take judicial notice of Crystal Run's Privacy Policy and rely on it to establish that Website visitors consented to the interception of their communications. MTD at 4, n.4. This argument fails at every step.

**A. The Privacy Policy Is Outside the Pleadings and Should Not Be Considered.**

As a threshold matter, the Privacy Policy was not referenced in the SAC. Plaintiffs neither cited it, relied upon it, nor incorporated it by reference and it does not form the basis of any of Plaintiffs' claims. Although courts may consider documents "integral to" a complaint on a motion to dismiss or "incorporated in it by reference", a document that the plaintiff never referenced or relied upon does not meet that standard. *Chambers v. Time Warner, Inc*., 282 F.3d 147, 152-153 (2d Cir. 2002). Defendants' attempt to introduce the Privacy Policy is an improper effort to expand the record beyond the pleadings at the 12(b)(6) stage.

Defendants' request for judicial notice under Federal Rule of Evidence 201(b) fares no better. Judicial notice is limited to facts "not subject to reasonable dispute." The Privacy Policy fails this test for at least two reasons. First, website content can be changed at any time. While Defendants submit an attorney declaration purporting to authenticate the Privacy Policy, the declarant is litigation counsel, not a Crystal Run employee with personal knowledge of the website's content or the history of its privacy disclosures. The declaration does not establish that the version submitted is the version that existed when Plaintiffs visited the website, or that it remained unchanged throughout the relevant period. *Cf.* Fed. R. Evid. 201(b)(2) (a fact can only be judicially noticed "from sources whose accuracy cannot reasonably be questioned."). Second, whether Crystal Run's privacy disclosures accurately described the scope of data actually being transmitted to Google and The Trade Desk is precisely the kind of contested factual question that judicial notice cannot resolve. *See Wells Fargo Bank, N.A. v. U.S. Life Ins. Co. of N.Y*, 2026 WL 1492916, at *16 (S.D.N.Y. May 28, 2026) ("even if a fact comes from a 'source whose accuracy cannot reasonably be questioned, the fact must itself meet a 'high degree of indisputability' to be judicially noticeable" (cleaned up and quoting *CITGO Petro. Corp. v. Ascot Underwriting Ltd.*,

158 F.4th 368, 379-80 (2d Cir. 2025))).

If the court elects to consider this unpleaded document, it is obligated under Rule 12(d) to convert the motion to one for summary judgment and give the parties an opportunity to conduct appropriate discovery and submit the additional supporting material contemplated by Rule 56. This conversion requirement is "mandatory" and "strictly enforced." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006). While Plaintiffs' position is that the court has no basis to consider this document at this stage, they reserve their right to seek such discovery if the court proceeds to do so.

### B. Even On Defendants' Own Description, No Affirmative Consent Was Obtained.

Even if the Court were to consider the Privacy Policy, Defendants' own description of it reveals the complete absence of any mechanism for obtaining affirmative consent. Defendants state only that the Privacy Policy is "hyperlinked at the bottom of each page." MTD at 4. What Defendants describe appears, on its face, to be what courts have termed a "browsewrap" arrangement, in which terms are made available via a passive hyperlink but the user is never required to demonstrate awareness of or assent to them. As the Second Circuit has held, provisions disclosed solely through browsewrap agreements are typically only enforced if "the website user must have had actual or constructive knowledge of the site's terms and conditions, and have manifested assent to them." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 129 n.18 (2d Cir. 2012) (quoting *Cvent, Inc. v. Eventbrite, Inc.,* 739 F. Supp. 2d 927, 937-28 (E.D. Va. 2010)).

Defendants have placed nothing before the Court establishing that Plaintiffs were ever exposed to, aware of, or assented to the Privacy Policy's terms. They do not allege, nor could they on this record, that Plaintiffs ever clicked on that hyperlink, read the Privacy Policy, or took any

affirmative action manifesting awareness of its terms. They identify no pop-up, no click-through gate, no checkbox, and no other consent mechanism. On Defendants' own telling, a user could navigate the entire Website, search for doctors, request appointments, and research medical conditions without ever encountering the Privacy Policy's substance. That alone is fatal to their consent argument at the pleading stage.

This deficiency is compounded by the SAC's allegation that the trackers begin intercepting users' communications immediately and automatically upon visiting the Website, before any user has an opportunity to review or consent to any data practices. SAC ¶ 79. A passive hyperlink at the bottom of a page cannot constitute consent to interceptions that have already begun before the user could possibly reach it.

**V. THE RULE OF LENITY DOES NOT APPLY.**

Defendants invoke the Rule of Lenity, arguing that any ambiguity in the Wiretap Act should be construed in their favor because the Act is a criminal statute. MTD at 18. But the Rule of Lenity is a canon of last resort that applies only where a statute is "grievous[ly] ambiguous" after exhausting all traditional tools of statutory construction. *Muscarello v. United States*, 524 U.S. 125, 138–39 (1998). The Wiretap Act's terms, such as "intercept," "contents," and "procure", all have established meanings, and the many courts that have applied the Act to website tracking in the healthcare context have done so without finding any ambiguity requiring resort to the Rule of Lenity.

To the extent Defendants point to the split in judicial authority over the application of the crime-tort exception to website tracking as evidence of statutory ambiguity, the Supreme Court has squarely foreclosed that argument. *Reno v. Koray*, 515 U.S. 50, 64–65 (1995) ("[a] statute is not ambiguous for purposes of lenity merely because there is a division of judicial authority over

its proper construction." (internal quotation omitted)). The existence of competing judicial interpretations reflects the novelty of the factual context, not any genuine ambiguity in the statutory text. The Rule of Lenity has no application here.

## VI. PLAINTIFFS STATE A CLAIM FOR BREACH OF IMPLIED CONTRACT.

Defendants argue that the breach of implied contract claim fails because (1) no contract was formed and (2) Plaintiffs have not alleged cognizable damages. MTD at 19. Both arguments are without merit.

### A. The Healthcare Context Establishes Mutual Assent To Confidentiality.

Defendants contend that Plaintiffs allege only their own belief that an implied contract existed, and that nothing shows Crystal Run agreed to the bargain. *Id.* at 19–20. This argument ignores the well-established principle that an implied contract need not rest on a written document or an explicit exchange of promises. Under New York law, an implied-in-fact contract arises from the conduct, situation, and relations of the parties, and mutual assent may be inferred from the circumstances surrounding the transaction. *See Leibowitz v. Cornell Univ.*, 584 F.3d 487, 506-7 (2d Cir. 2009) ("[a] contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the 'presumed' intention of the parties as indicated by their conduct" (internal citation omitted)).

Here, the circumstances powerfully support the existence of an implied contract. Crystal Run is a healthcare provider. Plaintiffs visited Crystal Run's website to find doctors, request appointments, search for medical specialties, and otherwise engage with Crystal Run's healthcare services. SAC ¶¶ 91–92. Under New York law, a physician who enters into an agreement with a patient to provide medical attention "impliedly covenants to keep in confidence all disclosures

made by the patient concerning the patient's physical or mental condition as well as all matters discovered by the physician in the course of examination or treatment." *Doe v. Roe*, 93 Misc. 2d 201, 210 (N.Y. Sup. Ct. 1977); see also *Perry v. Rockmore*, 238 A.D.3d 67, 69-70 (N.Y. App. Div. 3d Dep't 2025). When a person interacts with a healthcare provider's website to seek medical care, both parties understand that the interaction involves sensitive health information and that the provider will treat it confidentially. That mutual understanding is the implied contract. It arises not from any written document but from the nature of the healthcare relationship, the regulatory backdrop (including HIPAA and state confidentiality laws), and the reasonable expectations of both parties.

Defendants' attempt to deny the existence of a healthcare relationship by emphasizing that Plaintiffs interacted only with "public pages" of the Website, not the patient portal, is unpersuasive. A person who visits a healthcare provider's website to find a doctor, request an appointment, or search for a medical specialty is engaging with the provider's healthcare services, regardless of whether they have logged into a patient portal. The very purpose of the Website is to facilitate patient care. SAC ¶¶ 2, 49. The distinction between public and authenticated pages does not eliminate the reasonable expectation of confidentiality that attaches to healthcare-seeking activity.

**B. The Privacy Policy Does Not Negate The Implied Duty Of Confidentiality.**

Defendants' argument that the Privacy Policy's generic disclosures about cookies and third-party technologies defeat the implied contract faces the same threshold problems identified in Section IV, *supra*: the Privacy Policy is outside the pleadings, Defendants have not established that Plaintiffs ever saw it, and its description suggests no mechanism for obtaining affirmative consent.

But even if the Court were to consider the Privacy Policy, it would not negate the implied duty of confidentiality arising from the healthcare relationship. *See Doe v. Roe*, 93 Misc. 2d at 210. A reasonable patient would not read boilerplate language about "cookies" and "web beacons" as authorization for the provider to transmit their physician searches, medical condition queries, and appointment requests to advertising platforms like Google and The Trade Desk alongside persistent or personally identifying trackers. Generic privacy policy disclosures about the use of tracking technologies are materially different from a clear, specific disclosure that a healthcare provider will share patients' health-related browsing activity with advertising companies for commercial purposes. The implied duty of confidentiality that arises from the healthcare context is not overridden by vague, generalized language that no reasonable patient would understand as authorizing the specific conduct alleged here.

**C. Plaintiffs Adequately Allege Damages.**

Defendants challenge four theories of damages: loss of the benefit of the bargain, loss of data value, invasion of privacy, and chilling effect. MTD at 21. Plaintiffs have adequately alleged damages.

Plaintiffs allege that they received healthcare services that were "diminished in value due to the failure to provide the promised confidentiality." SAC ¶ 122. The confidentiality of healthcare interactions has cognizable economic value. When a patient interacts with a healthcare provider, part of what they receive (and, in many cases, part of what they pay for) is the confidential treatment of their health information. *See Doe v. Roe*, 93 Misc. 2d at 210. Where that confidentiality is breached, the services received are worth less than what was promised. This is a recognized theory of benefit-of-the-bargain damages. Defendants' objection that Plaintiffs do not

allege they received "substandard medical services" misses the point: the bargain was not merely for medical treatment but for *confidential* medical treatment, and it is the confidentiality component that was breached.

Plaintiffs adequately allege loss of data value. The SAC alleges that personal health data has significant and well-documented economic value, citing FTC findings, data broker markets, and the premium health data commands. SAC ¶¶ 82–87. Crystal Run obtained this data and made it available to Google and The Trade Desk for commercial exploitation without Plaintiffs' informed consent or compensation. *Id.* ¶¶ 76, 108, 124. That Plaintiffs did not personally attempt to sell their data does not defeat the claim; the allegation is not that Plaintiffs lost a sale, but that Defendants extracted recognized economic value from Plaintiffs' data without consent or without paying for it.

## VII. PLAINTIFFS STATE A CLAIM FOR UNJUST ENRICHMENT.

Defendants argue that the unjust enrichment claim should be dismissed as duplicative of other claims, and because Plaintiffs fail to plead the elements of the claim. MTD at 24. Neither argument warrants dismissal.

### A. The Unjust Enrichment Claim Is Not Duplicative Because The Existence Of An Implied Contract Is Disputed.

Defendants argue that the unjust enrichment claim is impermissibly duplicative of the Wiretap Act and breach of implied contract claims under *Coresello v. Verizon New York, Inc.*, 967 N.E.2d 1177 (N.Y. 2012). But Defendants' position is internally contradictory. They argue in Section III.A of their motion that no implied contract was formed because there was no mutual assent. MTD at 19–20. They then argue in Section III.B that the unjust enrichment claim must be dismissed because it duplicates the implied contract claim. *Id.* at 24–25. They cannot have it both

ways.

Under New York law, unjust enrichment "lies as a quasi-contract claim" that "contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties." *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (N.Y. 2012) (internal quotation marks omitted). The duplicativeness bar under *Coresello* applies when the plaintiff has an existing, viable claim that fully captures the alleged wrong. But where, as here, Defendants vigorously dispute the existence of the implied contract, the very predicate for the duplicativeness objection is uncertain. If the Court were to agree with Defendants that no implied contract was formed, then there would be no contract claim to duplicate, and unjust enrichment would be precisely the equitable remedy designed to fill the gap. Dismissing the unjust enrichment claim at this stage while the implied contract claim is itself under attack would risk leaving Plaintiffs with no remedy at all.

Plaintiffs acknowledge that in *Cooper*, this District dismissed an unjust enrichment claim as duplicative of a surviving implied contract claim in a healthcare pixel-tracking case. 742 F. Supp. 3d at 386–87. But the posture in *Cooper* was materially different: the defendant in *Cooper* did not challenge the formation of the implied contract, but merely alleged it was duplicative of other pleaded common law claims such as breach of fiduciary duty, breach of confidence, and constructive bailment. *Id* at 385. The Court merely held that the claims were duplicative. *Id.* The implied contract claim survived, and the unjust enrichment claim was therefore redundant. Here, by contrast, Defendants are mounting a frontal attack on the implied contract claim's viability. If the Court sustains both the implied contract and unjust enrichment claims at this stage but ultimately concludes after further proceedings that no implied contract existed, the unjust enrichment claim would remain as the appropriate equitable fallback. Dismissing it now would be

premature.

Federal Rule of Civil Procedure 8(d)(2) expressly permits parties to "set out 2 or more statements of a claim or defense alternatively or hypothetically." This Court recognized in *Cooper* that Rule 8 permits alternative and even inconsistent pleading. *See* 742 F. Supp. 3d at 385 (citing *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 406–07 (S.D.N.Y. 2001)). Rule 8(f) also requires that pleadings "must be construed to do justice." To the extent the unjust enrichment claim is viewed as an alternative to the implied contract claim, it should be permitted to proceed until the viability of the implied contract claim is resolved.

**B. Plaintiffs Adequately Plead The Elements Of Unjust Enrichment.**

Defendants contend that Plaintiffs fail to plead that Crystal Run was enriched, that the enrichment was at Plaintiffs' expense, or that it would be unjust for Crystal Run to retain the benefit. Each contention is without merit at the pleading stage.

*Enrichment.* Crystal Run received tangible commercial benefits from its tracking arrangement with Google and The Trade Desk. The SAC alleges that Crystal Run implemented the trackers for advertising and analytics purposes, including the ability to deliver targeted advertisements and to improve marketing. SAC ¶¶ 76, 108, 124. These are concrete, quantifiable benefits. Defendants received advertising capabilities and potentially increased revenue from its data-sharing arrangement with the Technology Vendors. Under New York law, "any increase in wealth--even if unrealized or illiquid--is an enrichment." *JPMorgan Chase Bank, N.A. v. Maurer*, 2015 WL 539494, at *6 (S.D.N.Y. Feb. 10, 2015). Plaintiffs need not demonstrate that Crystal Run converted these benefits into a specific dollar amount to state a claim.

*At Plaintiffs' expense.* The enrichment came at Plaintiffs' expense because Crystal Run extracted value from their health-related browsing data without their informed consent and without

compensation. The SAC alleges that personal health data has significant commercial value, supported by citations to FTC reports and news coverage of the data broker industry. SAC ¶¶ 82–87. Crystal Run obtained and monetized this data through its arrangement with the Technology Vendors. *See id.* ¶ 37, 60, 75, 76. That Plaintiffs did not personally attempt to sell their data does not mean the data lacked value; it means Crystal Run took the value without paying for it.

*Inequity.* The context here is critical. This is not a case about a retail website monetizing generic browsing data. It is a case about a healthcare provider extracting commercial value from patients' health-related communications—their doctor searches, their medical condition queries, their appointment requests—and transmitting that information to advertising companies. The expectation of confidentiality in the healthcare context is categorically different from the expectations that attend browsing a commercial website. It would be inequitable to permit a healthcare provider to retain the commercial benefits of exploiting patients' health data when those patients reasonably expected their interactions with a healthcare provider to remain confidential.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

Respectfully submitted,

By: /s/ *Scott E. Reiser*
Scott E. Reiser
JAVERBAUM WURGAFT HICKS KAHN WILSTROM & SININS, P.C.
103 Eisenhower Parkway, Suite 401
Roseland, NJ 07068
Tel: (973) 228-6738
Fax: (973) 403-9021
Email: sreiser@lawjw.com

By: /s/ *Fletcher Trammell*
Fletcher V. Trammell
TRAMMELL PC
*Pro Hac Vice*
3262 Westheimer Road, Suite 423
Houston, Texas 77098
Tel: (800) 405-1740
Fax: (800) 532-0992
fletch@trammellpc.com

*Counsel for Plaintiffs*

**CERTIFICATE OF WORD COUNT**

Pursuant to Local Rule 7.1(c), I certify that the accompanying memorandum of law contains 8,444 words, excluding the parts of the document exempted by Local Rule 7.1(c). This certificate was prepared in reliance on the word-count function of the word processing system (Microsoft Word) used to prepare the document.

/s Scott E. Reiser
SCOTT E. REISER

Dated: June 17, 2026